CHARLES BELINFANTE *vs.* MAYOR OF REVERE & others.[1]

Suffolk.    April 7, 1967. — June 12, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& REARDON, JJ.

*Housing.    Public Officer.*

An order of the mayor of a city removing one from the office of member of the local housing authority on the alleged ground of inefficiency and neglect of duty was not supported by evidence of the member's conduct in advocating the appointment of a friend of his as executive director of the authority and joining with the other members thereof in voting to employ him without making any general search for other qualified applicants, in promoting the making of a ten year contract between the authority and the appointee the terms of which imposed a high standard of performance on the appointee, or in initiating increases in the appointee's salary and automobile allowance following the making of such contract.

PETITION for a writ of certiorari filed in the Supreme Judicial Court for the county of Suffolk on July 6, 1966.

Upon transfer to the Superior Court, the case was heard by *Mitchell, J.*

*Ralph F. Martino,* City Solicitor, for the respondents.

*Ben G. Gilbert (Gary T. Gilbert* with him) for the petitioner.

WHITTEMORE, J.    This is an appeal under G. L. c. 213, § 1D, from an order for judgment in the Superior Court

---

[1] The other respondents are members of the Revere City Council.

which quashed the decision and order of the mayor of Revere removing the petitioner from his office of member of the Revere Housing Authority for inefficiency and neglect of duty.

General Laws c. 121, § 26M, provides: "The mayor, with the approval of the city council . . . may make . . . written charges against, and may after hearing remove, because of inefficiency, neglect of duty and misconduct in office, or any of such causes, a member of a housing authority appointed by the mayor and confirmed by the city council . . .." There are provisions for notice and hearing which were complied with. The city council approved the mayor's action.

The charges of the mayor, and his findings, relate to the appointment, effective "on or about August 4, 1964," of Carl Hyman as executive director of the Housing Authority and to the subsequent action of the Authority[2] in contracting with Hyman for a ten year term and thereafter increasing his salary.

The issue is whether there was evidence which as matter of law permitted the finding of inefficiency and neglect of duty. The respondents' brief summarizes the acts and omissions of the petitioner on which they rely as set out in the margin.[3]

---

[2] By G. L. c. 121, § 26L, the local Housing Authority consisted of five members, four appointed by the mayor subject to confirmation by the city council and one by the State Housing Board.

[3] "(a) Failing to establish standards, duties and qualifications for the position of Executive Director in accordance with the provisions of Section 26N of Chapter 121. (b) Proceeding to the appointment of an Executive Director on an application submitted containing self-serving statements of the applicant with no verification, no investigation or amplification of the statements contained therein and no examination of the applicant to assist him in determining his qualifications. (c) For failing to use all reasonable efforts to secure as many qualified applicants for the position by advertising, publicizing and by contacting agencies that would be of assistance in directing attention to possible applicants. (d) By proposing a contract for a period of time which was the first in the entire Commonwealth for such a period of time and substantially in excess of the usual period of time for such a contract. (e) By proposing and voting for such a contract without having the new applicant serve a probationary period for the purposes of observing and establishing that such new applicant was fully qualified of performing the duties required of the Executive Director. (f) By proposing and voting for increases in salary of an Executive Director who was already under contract to perform the same services for the compensation stated in the original contract."

The basic facts are not in dispute. Early in 1964 it became known that the then executive director would, in the course of that year, retire by reason of age. The Authority did not advertise or publicize the vacancy. Under date of July 8, 1964, Hyman applied for the position, stating in his letter his asserted qualifications and attaching a copy of his army separation papers. He spoke with each member of the Authority. The petitioner had known him well for many years and testified that he believed him qualified. At the Authority's meeting on July 11, 1964, the five members "discussed in a general way the question of appointing a new Executive Director"; ascertained by a telephone call to the then assistant executive director that he was not interested, caused the application from Hyman to be read and made a part of the minutes; and, on the motion of the petitioner, unanimously voted to appoint Hyman effective August 3, 1964, as executive director, assistant treasurer, and secretary of the Authority at a starting salary of $8,750 annually "covering projects in the management stage." This was the same compensation as that which the retiring director had been receiving. Hyman was also to receive compensation of $1,200 a year for an Ocean Avenue or urban renewal project. The retiring director had received $900 a year for his services to this project.

The division of housing in the Department of Commerce and Development exercised supervisory control over local housing authorities. G. L. c. 121, § 26U. See St. 1964, c. 636, § 1. *Sullivan* v. *Fall River Housing Authy.* 348 Mass. 738, 739. Hyman called at the division's office before he was hired and was interviewed by the director of management. He submitted a copy of his army separation papers.

On October 4, 1964, pursuant to a vote on a motion of the petitioner, the Authority executed an employment contract with Hyman for a period of ten years beginning October 15, 1964. The stated compensation was the sum of the two items mentioned above ($8,750 and $1,200). The contract (dated October 5, 1964), specified the duties, rights, and

authorities of the director.   The ten year contract was the petitioner's idea.   He was the moving force behind this and the other action taken in respect of Hyman.   He appears to have made many of the motions in respect of other action of the Authority so far as shown in the exhibits.   The contract was submitted to the division of housing.   The division requested that there be inserted a clause giving the Authority the right to dismiss the executive director "if he wilfully refuses to perform his regular duties, or if he is determined, by the Authority, to be negligent or incompetent in carrying out his duties . . . or in the event of prolonged illness which substantially interferes with the performance of his duties."   This change was made in due course and the division of housing, on December 7, 1964, informed the Authority that it had reviewed and approved the contract.   There was also a requirement that such a contract be submitted to the Federal Public Housing Administration.   The approval of that agency was obtained.

The Authority on December 10, 1964, voted to amend the October 5 contract by increasing the executive director's compensation by $1,250.   The division of housing approved this on December 28, 1964, "contingent upon approval by the Public Housing Administration."   Under date of April 15, 1965, the Public Housing Administration wrote that pursuant to the Authority's request of February 25, 1965, the Administration had "reconsidered our determination of salary for your Executive Director," and that effective December 28, 1964, the Authority might increase the salary as requested.   Certain understandings were set out.

In January, 1966, in connection with a general increase to employees of the Authority, an increase of $500 was voted to Hyman.

The Authority on November 12, 1964, voted to increase the car allowance of the executive director from $40 to $75 monthly effective November 1, 1964.

There was no showing of additional work load placed on Hyman beyond that of his predecessor.   The mayor could have concluded that the duties in respect of the urban re-

Belinfante v. Mayor of Revere.

newal project were somewhat lessened. There was no evidence that Hyman was not competent and doing good work. The chairman of the Authority testified that Hyman, having then been in office more than a year, had done an excellent job.

We see nothing to suggest inefficiency or neglect of duty in the petitioner's conduct in advocating Hyman's appointment and joining with the other members in voting to employ him. Hyman's original application tended to show that he was qualified for administrative work.[4] We see no basis for concluding that it was negligent or inefficient to engage the only applicant without making any general search. For all that the evidence shows or suggests, the members had reasonably satisfied themselves as to Hyman's qualifications.

Nor do we think that the making of a ten year contract could be found to be negligent or inefficient. The contract even as first drafted was not improvident. Under it the director was required to account and report regularly, keep records in a form satisfactory to the Authority, select tenants and act in respect of rentals under the direction of the Authority and subject to its policies and procedures, negotiate contracts and make purchases in accordance with approved procedures, maintain adequate inventories, "administer the project in its fiscal, budgetary and personnel operation in a business-like manner," "be responsible . . . for . . . proper maintenance" and for the "purchases of equipment, materials and contract labor . . . to satisfactorily carry out the job of good maintenance," and "to operate the project . . . [so as to provide] a high degree of livability and good appearance at the lowest pos-

---

[4] The army separation paper set out: "Has handled all types of administrative work. Was personnel sergeant Major, in charge of 60 persons. Had knowledge of and responsibility for the work of every man. Handled disciplinary functions, payrolls, insurance, allotments, service records, transfers, discharges, classification, assignments, morning reports and official correspondence . . . Adjutant Generals School . . . . Completed 8 weeks training in advance administration." The application recited "I have been in the contracting business for the last twenty years and know all about real estate." His letterhead recited "General Contractor, Interior — PAINTING — Exterior."

sible cost consistent with satisfactory administration and maintenance.''

These terms imposed a higher standard of performance than that required to avoid the effect of the dismissal clause inserted at the request of the division of housing. The Authority, under general principles of contract law, would have had a basis for discharging Hyman if his work was not reasonably satisfactory.

That there were no other ten year contracts in the Commonwealth[5] did not permit a finding of negligence or inefficiency. A contract for such a term is not presumptively without substantial advantage to the Authority. Freedom from the pressures of a short term is commonly recognized as advantageous to the public which the executive serves. The deputy commissioner for the division of housing, who passed on the contract and the increase in salary, testified that the ten year term ''didn't disturb . . . [him] too much because at that time there was legislation pending on the Hill that would grant life tenure and I personally supported that legislation with the exception of part-time directors.'' The salary was in line with what was being paid other executive directors in communities the size of Revere. This was true of the increase also. ''It wasn't too far off.''

It could not be ruled that the increase in salary after the ten year contract had been agreed to was beyond the power of the Authority or that it was improvident or evidence of neglect or inefficiency. Notwithstanding the existing contract, the Authority could have believed Hyman was worth the higher salary and that it would be in the public interest to have him paid what he was believed to be worth. There is no showing to the contrary. The inferences warranted by the increase in salary so soon after the first contract had been approved do not include an intention to impose on the public or act against its best interests. We note the testimony of the chairman of the board that the Authority, prior

---

[5] There were three, five and seven year contracts with other executive directors, and in Brockton there was a five year contract extendable for a second five years after the first two years of the contract.

to the end of the employment of the executive director who preceded Hyman, had decided to increase that employee's salary, he having asked for an increase of ten per cent.

There appears also nothing negligent or inefficient in the vote to increase the automobile allowance.

We recognize the possibility that the Authority may have acted from political or personal motives, but there is no direct evidence of this. No doubt the mayor concluded that it might have been possible to have all the benefits of Hyman's services or those of some other person, as well or better qualified, on more favorable terms, and that according to best administrative practices the Authority would have explored the possibilities. He may have believed that the members of the Authority were interested in giving a good job to the friend of one of their number. Such speculative possibilities were not ground for removal. We are not in this case concerned with a family conflict of interest, nor with whether it would have been better judgment and, at the least, appropriate, for the petitioner, as a public officer, to let others take the initiative in respect of the employment and compensation of his friend.

We see nothing in the concluding suggestions of the respondents' brief that the petitioner was shown to be lacking in knowledge of the purposes and intent of the Authority to the point that he could be found negligent or inefficient in the performance of his duties.

*Order for judgment affirmed.*