**David B. MILLER, et al.,
Plaintiffs, Appellees,**

**v.**

**TOWN OF HULL, MASSACHUSETTS,
etc., et al., Defendants, Appellants.**

**No. 88–1969.**

United States Court of Appeals,
First Circuit.

Heard April 5, 1989.

Decided June 21, 1989.

---

524

Mitchell J. Sikora, Jr., with whom Vincent L. DiCianni and Ferriter, Scobbo, Sikora, Caruso & Rodophele, P.C., were on brief for defendants, appellants.

Harvey A. Schwartz with whom Dale C. Schneider and Schwartz, Shaw & Griffith were on brief for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and CAFFREY,* Senior District Judge.

* Of the District of Massachusetts, sitting by designation.

BOWNES, Circuit Judge.

This civil rights case arises out of a dispute between members of the Hull Redevelopment Authority (HRA) and members of the Hull Board of Selectmen (Board). Defendants-appellants, the Town of Hull and individual Board members—E. Reno Constantinides, the Chairman, Myron Klayman, Nancy Burns and Claudette Fitzsimmons [1]—appeal a jury's finding of liability and award of damages for plaintiffs-appellees, elected members of the HRA—David Miller, the Chairman, Nancy Dunn and Richard Musmeci.[2] For the reasons set forth below, we affirm.

## I. FACTS

Before reciting the facts that bear on this particular case, we describe the legislative framework for a redevelopment authority and the control a Board of Selectmen has over it. Under Massachusetts law, a " 'Redevelopment authority', [is] a public body politic and corporate created pursuant to [Mass.Gen.L. ch. 121B, § 4]." Mass.Gen.L. ch. 121B, § 1. Chapter 121B deals differently with redevelopment authorities in towns as opposed to cities; because Hull is a town, we focus on redevelopment authorities in towns. Pursuant to § 4, the people of a town vote for the organization of a redevelopment authority. Dissolution also requires a vote by the people of the town *after* the redevelopment authority proposes dissolution. *Id.* There

are five members on every redevelopment authority. § 5. In towns, four of the members are elected by the public; one is appointed by the state department of community affairs (DCA). As an urban renewal agency, *see* § 9, a redevelopment authority has broad powers under § 11 and more specific ones under §§ 45–57. An elected member of a redevelopment authority may be removed by the Board of Selectmen for "inefficiency, neglect of duty or misconduct in office" subject to certain procedural safeguards including notice and a hearing. § 6.[3] The Board may also refer charges of the same to DCA with respect to the member appointed by that department. DCA may then remove the member subject to the same procedural safeguards. *Id.* During the pendency of charges, the people with the power to remove have the power to suspend temporarily. *Id.* During suspension, temporary members may be appointed by the people who suspended the members. *Id.* A vacancy created by an elected member before the end of a term is filled by the Board. § 5.

"We begin by setting forth the relevant facts, mindful that we review the evidence and inferences fairly drawn therefrom in the light most favorable to the prevailing party." *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 732 (1st Cir. 1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). In 1961, the people of Hull voted to establish a redevel-

---

1. Louis Costa was the fifth member of the Board, but he was not named as a defendant.

2. The other two members of the HRA were Frederick Alibrandi, an elected member and Robert Tong, the appointed member. Alibrandi was not a plaintiff. Tong was originally a plaintiff, but he was dismissed prior to trial at his own request.

3. This statute reads in pertinent part:

 **Charges against members; hearing; removal; resignation; suspension**

 The mayor or city council or board of selectmen ... may, after hearing, remove any such member because of inefficiency, neglect of duty or misconduct in office provided that such member shall have been given, not less than fourteen days before the date set for such hearing, a copy in writing of the charges against him and written notice of the date and

place of hearing to be held thereon, and at the hearing shall have been given the opportunity to be represented by counsel and to be heard in his defense. The mayor and city council or board of selectmen may also make or receive written charges against any member of a housing or redevelopment authority in such city or town appointed by the department and refer the same to the department which may proceed in the same manner as the mayor and city council or board of selectmen under the preceding sentence. Pending final action upon any such charges, the officer or officers having the power to remove such member may temporarily suspend him, provided that they shall immediately reinstate him in office if they find such charges have not been substantiated, and may appoint a person to perform the duties of such suspended member until he is reinstated or until he is removed and his successor is qualified.

opment authority. In 1968, a 33 acre tract of land was slated for redevelopment in Hull. As a requirement of the United States Department of Housing and Urban Development (HUD), the HRA and the Board entered into a cooperation agreement. The agreement called for the town and all town departments to cooperate with the HRA in carrying out the redevelopment project. The agreement also called for the town to pay for 25% of the project in "cash or non-cash grants-in-aid." Most of the funds were to come from federal and state sources. The agreement could only be amended with the consent of HUD.

In 1978, the HRA entered into a contract with Consultants, Inc. (Consultants) for the redevelopment of the entire 33 acre tract. Part of this contract called for the construction of a housing building for the elderly with 150 units. Over the next three years this contract was amended several times in ways not relevant to this case. In December 1981, an eighth amendment was added. In this amendment, Consultants agreed to give up its rights to develop the entire tract and to go forward with only the housing project for the elderly. HRA was thus free to negotiate with another developer for the balance of the tract. It knew of a developer, Joel Grae, who was interested in developing the rest of the tract.

The defendants had been consistently opposed to the housing project for the elderly for a variety of reasons. It would be inconsistent with a proposal for a gambling casino in another part of Hull. The inconsistency was that Hull was asking for permission from the state to allow a casino on the grounds of poverty. If a full-scale redevelopment plan was in progress, including the housing project for the elderly, such a claim would be undercut. Furthermore, if the land was used for housing for the elderly, it could not be used for ancillary casino needs. A housing unit for the elderly would not be compatible with the proposed development of other areas in the redevelopment area. The developer, Joel Grae, wanted to build luxury condominiums on adjoining land; he contacted defendant, Constantinides, several times about the

housing project for the elderly. Finally, the need for 150 units was questioned by the Board despite studies showing such a need for Hull residents.

The disagreement between HRA and the Board members on this issue led to a breakdown in relations between the two bodies. A letter, sent by Constantinides to Miller in August 1981, summarizes the problem:

> It is the position of the Board of Selectmen that, should the Redevelopment Authority negotiate the erection of subsidized Section Eight housing, by Consultants, Inc., on parcel 14A, the Board of Selectmen will take appropriate action to oppose them, as the Board of Selectmen does not favor such a plan.

> The Board finds that such a plan would be prejudicial and inimical to the proper development of the entire urban renewal area.

When the HRA refused to back down, the Board sponsored two articles for town vote. The first was to abolish the HRA. This article passed but no further action was taken to enforce it—possibly because it was not in conformity with Massachusetts law which requires that a housing authority must first propose dissolution before a town can vote to abolish it. Mass. Gen.L. ch. 121B, § 4. The second article called for a building height limit of 40 feet in the redevelopment area. Such a limit would have been the death knell for the project for the elderly. This article also passed, but both HRA and HUD considered it unenforceable and a breach of the cooperation agreement. Consultants was informed of the unenforceability of this article.

The Board also created financial difficulties for the HRA. The Town of Hull had never paid any cash to HRA to meet its 25% obligation, rather it had provided non-cash support. All money from HUD was paid to the Town and the Board was supposed to authorize expenditures and payments when requested by the HRA. At the time that the housing for the elderly issue heated up, the Board became more

chary in authorizing payments to the HRA. In early 1982, for instance, an audit revealed that the Board owed the HRA approximately $38,000. Rather than pay the sum, the Board dragged its heels and HRA was forced to bring a lawsuit for the money.

In early 1982, after it became clear from the last amendment to the Consultants contract that the housing for the elderly project would be built, the Board voted to reduce the project from 150 units to 75. If valid, this reduction would have made the project economically unfeasible. HRA and HUD took the position that this reduction was unenforceable and a breach of the cooperation agreement. Selectman Constantinides attended an HRA meeting in January 1982 and threatened retaliatory action if the HRA persisted with the project for the elderly.

Despite his misgivings about the project for the elderly, Joel Grae, the developer who wished to develop the rest of the 33 acre tract, continued to negotiate with HRA. Grae was concerned about the proximity of the project to an area on which he wanted to build luxury condominiums. By the end of February, 1982, a contract looked imminent and Grae was slated to give HRA $100,000 as a deposit by March 7. Consultants was also to give HRA $180,000 by April 1. These cash infusions would have made HRA financially independent from the Board.

Selectmen Burns and Constantinides attended an HRA meeting on February 26. At the meeting, Miller, of the HRA, announced that Consultants had published a request for bids on the housing project for the elderly and that construction was slated to begin by April 15.

On March 1, the Board voted to suspend all four elected members of HRA and to send charges to DCA along with a request for suspension with respect to Tong, the appointed member. The suspensions were based on identical charges against all five members. The Board appointed four temporary members whose views coincided with those of the Board. On March 2, an injunction was issued by a state court against the suspensions because of a violation of the notice requirements of Mass. Gen.L. ch. 121B, § 6.[4] After the injunction issued, Selectman Constantinides called Alibrandi of HRA and told him that if he would get certain documents for him out of the HRA files nothing further would happen. Alibrandi refused.

On March 3, HRA held an emergency meeting. Dunn, Miller, Musmeci and Alibrandi were present; Tong was out of town on business. After extending until June the time within which Consultants had to pay HRA $180,000, the meeting turned to discussion of the suspensions. It was decided to adjourn to the town hall where the Board was meeting. Musmeci, who was suffering from a bad back, did not go.

At the joint meeting, Constantinides told the three HRA members that if they did not vote on the spot to abrogate the cooperation agreement and to take the town off the hook for all future expenses, they would be suspended again. On the advice of HRA's counsel, who was present, Miller and Dunn refused. Alibrandi agreed to do whatever he was asked to do.

The next day, Miller, Dunn and Musmeci were again suspended on the same charges; DCA was again requested to suspend Tong. Alibrandi was allowed to remain in office. The Board appointed three temporary members whose views were more attuned to those of the Board. The new HRA dropped the $38,000 lawsuit against the Board. It informed Consultants that the housing project for the elderly was discontinued. This resulted in a lawsuit by Consultants against HRA, its members and members of the Board. This case is currently pending in federal court. To date, the housing for the elderly has not been built.

In addition to the eleven original charges against the members of the HRA, six new

4. Although not clear from the record, we assume that the state court injunction nullified the appointment of the four temporary appointees.

ones were added on March 15.[5] All three members were charged in exactly the same manner; no attempt was made to individualize the charges or to tailor them to the time frames during which a specific plaintiff was actually a member of HRA. All charges alleged neglect and inefficiency under Mass.Gen.L. ch. 121B, § 6. Misconduct was not alleged.

The Board commenced hearings on the charges against Dunn, Musmeci and Miller on March 29, 1982.[6] After the third hearing, the three suspended members were no longer able to afford legal counsel. Miller and Musmeci resigned rather than proceed; Dunn continued without counsel. In March 1983, the three eligible Board members[7] voted to find that Dunn had committed 15 of the 17 charges. Burns and Fitzsimmons voted for her removal; Klayman voted against it. The Board's final conclusions were memorialized in a 95-page document.

In May 1983, Dunn ran for and was re-elected to HRA. Thereafter, the Board sent the same charges to the State Ethics Commission, the State Inspector General and HUD. No action was taken by any of those bodies.

In July 1983, plaintiffs brought suit in federal district court against defendants pursuant to 42 U.S.C. §§ 1983, 1985, the Massachusetts Civil Rights Act, Mass.Gen. Laws ch. 12, § 11I, and Massachusetts common law. The § 1983 claims alleged violations of the first amendment and of both the procedural and substantive due process guarantees of the fourteenth amendment. The § 1985 claim alleged a conspiracy to remove plaintiffs from office; this count was dismissed at the close of plaintiffs' evidence because their offices were not federal. The Massachusetts Civil Rights claim alleged violations of both the federal and state constitutions. The state common law action was for the intentional infliction of emotional distress.

The district court denied defendants' motion for summary judgment. Defendants brought an interlocutory appeal. We dismissed the appeal because defendants did not assert a claim of qualified immunity in their summary judgment motion.

After a trial, the jury found for the plaintiffs and against all defendants. The jury awarded compensatory damages in the amounts of $47,400 to Dunn, $26,370 to Miller and $35,400 to Musmeci. The jury also awarded punitive damages in the amount of $43,700 to each plaintiff to be paid as follows: $42,100 by Burns, $41,400 by Constantinides, $42,100 by Fitzsimmons and $5,500 by Klayman. The jury answered the special interrogatories as follows:

1. Do you find that any of the defendants violated the rights of freedom of expression of the plaintiffs?

 Yes _X_ No ___

2. Do you find that any of the defendants violated the rights of the plaintiffs to hold public office?

 Yes _X_ No ___

2B. Do you find that any of the defendants violated the rights of the plaintiffs to fair procedures as a matter of due process of law?

 Yes _X_ No ___

3A. Do you find that any of the defendants acted by threat, intimidation, or coercion so as to violate the rights of plaintiffs to hold office as provided by the Massachusetts Constitution?

 Yes _X_ No ___

3B. Do you find that any of the defendants acted by threat, intimidation, or coercion so as to violate the rights of the plaintiffs to hold office as provided by the United States Constitution?

 Yes _X_ No ___

---

5. The 17 charges involved a potpourri of issues, some dating back to the mid-1970s. The charges involved: financial irregularities; the filing of the $38,000 lawsuit against the Board; record keeping; the HRA's executive director; open meeting laws; and the housing project for the elderly.

6. DCA refused to suspend Tong and did not remove him.

7. Only Burns, Fitzsimmons and Klayman had been present at all the hearings and were eligible to vote. Costa had died, and Constantinides had not been re-elected to the Board.

4. Do you find that the individual defendant Selectmen inflicted severe emotional distress on the plaintiffs as defined in my instructions to you without legal justification?

Yes ___ No _X_

5. Do you find that the defendant Selectmen acted with good faith and upon reasonable grounds in their suspension and subsequent removal proceeding against the plaintiffs?

Yes ___ No _X_

The district court entered judgment in accordance with the jury verdict. It denied defendants' motion for a judgment n.o.v. and awarded plaintiffs' attorneys' fees and costs in the amount of $95,994.59. The defendants appeal on numerous grounds. We discuss only those issues necessary to our decision.

## II. EXCLUSION OF THE BOARD'S FINAL DECISION

■■■ At trial, the defendants sought to introduce the Board's 95–page final decision. This decision was rendered following the hearings the Board held with respect to the charges against Dunn. This document was excluded by the court pursuant to Fed. R.Evid. 403,[8] after it balanced the probative value of the document against the prejudicial and cumulative nature of the document. A trial court's determination under Rule 403 is reviewed only for abuse of discretion. *See United States v. Mateos–Sanchez,* 864 F.2d 232, 235–36 (1st Cir. 1988); *United States v. Beltran,* 761 F.2d 1, 11 (1st Cir.1985); *United States v. Jarabek,* 726 F.2d 889, 903 (1st Cir.1984). We find no such abuse here. The court carefully weighed the probity of the evidence against its prejudicial and cumulative effects. It considered and rejected the efficacy of a limiting instruction. The defendants were allowed to put before the jury, via testimony, the information contained in the Board's final decision. Because the plaintiffs were not attacking the informa-

tion itself, the court decided not to allow the document into evidence. It stated that if the plaintiffs were to make such an attack, it would allow the document to come into evidence. The district court did not abuse its discretion in excluding the Board's final written decision.

## III. DEFENDANTS' CREATIVE *CREATIVE ENVIRONMENTS* ARGUMENT

■■■ Defendants argue that plaintiffs "cannot state a § 1983 federal constitutional or statutory cause of action so long as the state administrative process and state courts were available to remedy the original wrong." Brief at 36. They rely on *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982), and its progeny. Such reliance is misplaced.

In *Creative Environments,* a developer claimed that a local planning board had violated his due process rights when it rejected his application for a zoning variance. We held: "Such a claim is too typical of the run of the mill dispute between a developer and a town planning agency ... to rise to the level of a due process violation." *Id.* at 833. We did not hold that the availability of state administrative and court remedies barred such claims. We held that such claims, on the merits, do not state a due process violation. As we explained in a footnote:

A different situation may be presented in some instances, particularly in the realm of equal protection, involving gross abuse of power, invidious discrimination, or fundamentally unfair procedures. For example, in *Moran* [*v. Bench,* 353 F.2d 193 (1st Cir.1965)], we cited *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), a case in which the Supreme Court found that a San Francisco building ordinance vesting unreviewable, arbitrary power in city of-

---

8. Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

ficials was being enforced unconstitutionally so as to eliminate Chinese laundry operators. Different considerations may also be present where recognized fundamental constitutional rights are abridged by official action or state regulation. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). But the ordinary state administrative proceeding involving land use or zoning does not present such a situation, regardless of how disappointed the license or privilege seeker may feel at being initially turned down.

*Id.* at 832 n. 9; *see also Chiplin Enterprises, Inc. v. City of Lebanon*, 712 F.2d 1524, 1527–28 (1st Cir.1983). In cases relying on *Creative Environments*, we have found that the plaintiffs failed to state a due process claim. *See Quinn v. Bryson*, 739 F.2d 8, 9–10 (1st Cir.1984); *Cloutier v. Town of Epping*, 714 F.2d 1184, 1189–90 (1st Cir.1983); *Roy v. City of Augusta, Maine*, 712 F.2d 1517, 1523 (1st Cir.1983); *Chiplin Enterprises*, 712 F.2d at 1527; *cf. Raskiewicz v. Town of New Boston*, 754 F.2d 38, 44–45 (1st Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985). These cases are distinguishable from the present case on the ground that they involved refusals by local boards to grant licenses or zoning variances. Moreover, it is firmly settled that exhaustion or resort to state remedies is *not* a prerequisite to a § 1983 claim. *See Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993, 998–99 (1st Cir.1983) (applying *Patsy* to zoning cases).

*Creative Environments* and its progeny apply to certain due process claims. They do not (1) require exhaustion of state remedies or (2) apply to the deprivation of such fundamental constitutional rights as those protected by the first amendment. Since we affirm in section V, *infra*, the finding that plaintiffs' first amendment rights were violated, we need not decide what, if any, application *Creative Environments* has with respect to plaintiffs' due process or state law claims.[9]

## IV. STANDARD FOR REMOVAL

■ Defendants suspended plaintiffs from their elected positions on the HRA. Defendants alleged inefficiency and neglect of duty, but not misconduct, as the grounds for plaintiffs' removal. They purportedly relied on Mass.Gen.L. ch. 121B, § 6, which states in pertinent part: "The ... board of selectmen ... may, after hearing, remove any such member because of inefficiency, neglect of duty or misconduct in office.... Pending final action upon any such charges, the officer or officers having the power to remove such member may temporarily suspend him." In instructing the jury as to the standard for removal under the statute, the trial judge stated:

The grounds established by the Massachusetts law for removal of a redevelopment authority member are inefficiency and neglect of duty. The alleged neglect of duty or inefficiency sufficient to warrant the removal must be significant rather than insubstantial or trivial. The rule violated must be of importance to the administration of the office and must be so important that a public officer violating it becomes unfit for ... his or her office. This does not mean that a board member can be removed merely for errors of judgment or failure to follow good public policy practices. In order to find neglect of duty or inefficiency warranting removal, the defendants must show that the plaintiff violated a known

**9.** Defendants urge us to hold that in at least Dunn's case, and perhaps in all plaintiffs' cases, the claims are barred by principles of collateral estoppel. The collateral estoppel is said to derive from one of two sources: (1) the plaintiffs' claims could have been raised by plaintiffs in state court proceedings, *if* the plaintiffs had appealed the Board's final decision, or (2) the plaintiffs could have raised their claims before the Board itself. The first argument is merely another way of stating that plaintiffs should have exhausted their state remedies by appealing through the state courts and raising the issue there—a requirement of exhaustion which has been rejected by the United States Supreme Court. The second argument fails because plaintiffs' constitutional claims were at best tangential to removal proceedings; the Board's sole duty was to determine the validity of the charges against the plaintiffs.

and well established standard of conduct. The emphasis is in the necessity to establish that a known standard of conduct was violated. The duty violated must have been known or should have been known to the officers who allegedly violated it.

The court referred back to this instruction in delineating the plaintiffs' constitutional claims; it also repeated essentially the same instruction in response to a jury question during deliberations. The defendants objected to the court's equating "inefficiency and neglect of duty" with conduct which makes a person unfit for office. Defendants contend that such an instruction was tantamount to a directed verdict on this issue since three of the four individual defendants [10] testified that the plaintiffs were not unfit for office.[11]

The Massachusetts Supreme Judicial Court has held:

In the operation of [Mass.Gen.L. ch. 121B, § 6], which predicates removal upon the proof of misconduct in office, it is sufficient to prove that the public officer has become unfit for office by reason of his intentional violation of a known and significant rule or duty inherent in the obligations of his office.[1]

*Bunte v. Mayor of Boston*, 361 Mass. 71, 278 N.E.2d 709, 712 (1972). In the footnote, the court stated:

1. We do not intend to attach a narrow meaning to our use of the words "rule" and "duty." For example, we do not intend to exclude consideration of intentional violations of statutes, regulations, or ordinances. The emphasis here is in the necessity to establish that a known standard of conduct was violated. Otherwise, the words "misconduct in office" become impermissibly vague, and the risk arises that an office holder will suffer the stigma of removal for "misconduct in office" which was no more than an error of judgment.

*Id.* n. 1. The court explained its standard as follows:

Necessarily, the misconduct sufficient for removal from office must be significant, rather than unsubstantial or trivial. The rules or duties violated must be of importance in the administration of the public office. Otherwise stated, the rule or duty must be important enough so that its breach renders the officer unfit to continue to hold office.

*Id.* at 713; *see also id.* at 714 ("errors of judgment cannot be construed as misconduct in office") (citing *Belinfante v. Mayor of Revere*, 352 Mass. 712, 227 N.E.2d 502, 506 (1967)).

We recognize that *Bunte* dealt only with allegations of "misconduct," and that *Belinfante*, though dealing with neglect of duty and inefficiency, did not define those terms. Three considerations constrain us not to disturb the district court's interpretation of local law. First, adoption of the defendants' definition that neglect of duty and inefficiency are the same as common law negligence would conflict with the teaching of the Supreme Judicial Court that even in cases of neglect and inefficiency, errors in judgment are not sufficient for removal. *Belinfante*, 227 N.E.2d at 506. Removal of an official for common law negligence is, by definition, removal for an error in judgment. Second, removal of an elected official for less than a serious breach of duty would deprive the electorate of its choice of a representative whenever a majority of the Board of Selectmen disagreed with the HRA's handling of a matter.[12] Finally, we accord "much deference ... to a district court's construction of the

10. Burns, Fitzsimmons and Klayman so testified; Constantinides was not asked this question.

11. We note that defendants' requested instructions included all other aspects of the district court's instruction. In supplemental instructions, they requested instructions which would have equated neglect of duty and inefficiency with common law negligence.

12. Both *Bunte* and *Belinfante* involved situations where the housing officials were appointed by the mayor, *not* elected. If anything, the fact that plaintiffs were elected in the present case counsels for a higher removal standard than the one established in the previous Massachusetts cases.

law of the locality in which it sits." *Garcia v. Friesecke*, 597 F.2d 284, 295 (1st Cir.), *cert. denied*, 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979); *see also Rose v. Nashua Bd. of Educ.*, 679 F.2d 279, 281 (1st Cir.1982) (collecting cases).

Defendants argue that using the same standard for all three statutory grounds of "inefficiency, neglect of duty or misconduct" for removal renders the disjunctive wording superfluous or redundant. This argument, however, misses the import of the SJC's basic proposition that "[i]t is not the cause alleged which determines the appropriate standard, but rather the statutory provision." *McSweeney v. Town Manager of Lexington*, 379 Mass. 794, 401 N.E.2d 113, 116 (1980) (footnote omitted). The Massachusetts Supreme Judicial Court has determined that under the statute a high standard must be met before removal is appropriate, and the district court so instructed the jury. The instruction was not erroneous.

## V. FIRST AMENDMENT VIOLATION

 Although we have found no cases directly on point, probably because it is considered unassailable, we have no difficulty finding that the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment. This is especially true when the agency members are elected officials. There can be no more definite expression of opinion than by voting on a controversial public issue.[13]

We have found some cases that are helpful by analogy. In *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), Bond brought suit when the Georgia House of Representatives refused to seat him after he was duly elected because of statements he made concerning the war in Vietnam. The state argued that it was "constitutionally justified in exacting a higher standard of *loyalty* from its legislators than from its citizens." *Id.* at 135, 87 S.Ct. at 349 (emphasis in original). The Court responded that, while an oath of office may be required, "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Id.* at 135–36, 87 S.Ct. at 349. The Court rejected a differing first amendment standard for publicly-elected officials:

> The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators. Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them.

*Id.* at 136–37, 87 S.Ct. at 349–50; *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"). The "obligation to take positions" necessarily includes the right to

---

**13.** Defendants have cited no cases to the contrary. To be sure, public officials in politically relevant positions may sometimes be properly removed from office because of their political affiliation, and because of the political views they express, without running afoul of the First Amendment. *See Jimenez–Fuentes v. Torres–Gaztambide*, 807 F.2d 236 (1st Cir.1986) (en banc), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). *See generally Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In addition, discharging a government employee because of his speech on matters of personal interest, or because of speech that disrupts his agency's work, does not necessarily violate the First Amendment. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). But these situations are remote from the one presented in this case. When it is clear, as here, that political expression is not a legal or otherwise appropriate basis for defendants to have suspended or dismissed the public officials in question, then such a retaliatory suspension or dismissal violates the official's First Amendment rights. The Board of Selectmen's removal powers here were plainly not exercisable under Massachusetts law simply on the basis of defendants' agreement or disagreement with plaintiffs' position and views on matters of town policy.

vote freely on issues as they arise. *See Clarke v. United States,* 705 F.Supp. 605, 612 (D.D.C.1988). The right to vote freely enables legislators "to consummate their duty to their constituents." *Id.* And, as *Bond* makes clear, this right derives from the first amendment, which protects the official statements of legislators. *See also Wrzeski v. City of Madison, Wisconsin,* 558 F.Supp. 664 (W.D. Wisc.1983) (entering preliminary injunction against city ordinance which compelled council members to vote "aye" or "no" based on improper infringement of members first amendment right to refrain from voting).[14]

In *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court pointed out: "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972)." *Id.* at 383, 107 S.Ct. at 2896. Surely, elected members of a public agency may not be removed from office for voting contrary to the wishes of the Board of Selectmen. We turn now to determine the reasons for the suspension of plaintiffs from the Board.

The entire course of conduct by the defendants supports the conclusion that the plaintiffs were suspended because of the position they took as HRA members with respect to the housing project for the elderly. Defendants had harassed the HRA by threats of abolition and the actual withholding of funds. The Board sponsored ordinances which if enforceable would have effectively halted the housing project. De-

fendants even sought the removal of Tong, the appointed member, from HRA by sending charges to the DCA. The only member against whom charges were not lodged was the member who stated he would go along with the selectmen's wishes. And the Board, after removing the HRA members who disagreed with it, appointed temporary members who did its bidding. The evidence supports the jury finding that plaintiffs were removed for speaking out and voting for a project to which the Board was opposed. This was a violation of their first amendment rights. It was also a violation of the Massachusetts Civil Rights Act. We, therefore, need not discuss the other claims made by plaintiffs.

## VI. QUALIFIED IMMUNITY

██ The defendants argue that they are entitled to qualified immunity because the law was not clearly established at the time of their actions. In the most recent case on qualified immunity, the Court has counselled:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).

> Even if we acknowledge that the act of voting has sufficient expressive content to be accorded some First Amendment protection as symbolic speech, the public interest in obtaining compliance with federal court judgments that remedy constitutional violations unquestionably justifies whatever burden on expression has occurred. The council members remain free to express their views on all aspects of housing in Yonkers. But just as the First Amendment would not permit them to incite violation of federal law, it does not permit them to take action in violation of such law.
> *Id.* at 457 (citations omitted). This case obviously does not apply to the situation before us.

---

**14.** The only case we have found upholding a limitation on an elected official's right to vote freely is inapposite to the present case. In *United States v. City of Yonkers,* 856 F.2d 444 (2d Cir.1988), *cert. granted in part,* — U.S. —, 109 S.Ct. 1337, 103 L.Ed.2d 808 *cert. denied,* — U.S. —, 109 S.Ct. 1339, 103 L.Ed.2d 810 (1989), the city entered into a consent judgment in federal court, part of which required the Council to enact certain remedies. The court upheld contempt citations after the Council refused to vote as per the consent judgment. In addressing the council members' first amendment claims, the court stated:

We find that in the light of pre-existing law, the unlawfulness of removing plaintiffs from their positions on the HRA should have been apparent to defendants. In *Bond*, 385 U.S. 116, 87 S.Ct. 339, the Supreme Court specifically rejected the argument that elected officials have lesser first amendment rights than ordinary citizens. At the time the removals were effected, there was firmly embedded in our constitutional fabric the principle that government employees could not be discharged for reasons that infringed on the employee's right of freedom of speech. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). Given this, a reasonable public official could not have failed to recognize that elected officials cannot be discharged for taking political positions of their choice.

The defendants contend that the plaintiffs' failure to prove malicious intent or bad faith entitles defendants to qualified immunity. Even assuming subjective good faith has any relevance after *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), defendants' contention fails for two reasons—one legal, one factual. As a legal matter, a defendant is not entitled to qualified immunity if (1) it was clearly established that the defendant's actions would be a violation of the plaintiff's rights *or* (2) he acted in bad faith. *See Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). A finding that the law was clearly established renders an inquiry into good faith irrelevant. In addition, the jury specifically found that the defendants did not act in good faith. There was more than sufficient evidence to support this finding.

A reasonable member of the Board of Selectmen would have understood that removal of the members of the HRA for voting as they did, was an egregious violation of plaintiffs' first amendment right. Plaintiffs had a duty to vote on the controversial issue of housing for the elderly. The exercise of this duty was clearly protected by the first amendment. There is no basis for defendant's claim of qualified immunity.

## VII. PUNITIVE DAMAGES

■ Based on a claim that they acted in good faith, defendants argue that punitive damages were inappropriate. The Supreme Court has held:

> that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

*Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see also Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 829 n. 7 (1st Cir.1987) (quoting *Smith*). The trial court instructed the jury along the lines of *Smith*. Defendants do not contest the judge's instruction on this issue; rather, they attack the appropriateness of punitive damages given the facts of this case. The jury, in answering special interrogatories, found that defendants did not act in good faith but rather "acted by threat, intimidation, or coercion" to deprive plaintiffs of their rights. Such findings are amply supported in the record, and provide a basis for finding that defendants acted with reckless or callous indifference for plaintiffs' rights or with an evil motive or intent. *See Kercado–Melendez v. Aponte–Roque*, 829 F.2d 255, 267 (1st Cir.1987) (upholding punitive damages where "[t]he [defendant's] conduct, as found by the district court, demonstrated a steadfast intent to discharge [plaintiff], irrespective of her constitutional rights or the actual merits of the charges brought against her."), *cert. denied*, —— U.S. ——, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988). The award of punitive damages in this case was appropriate.[15]

## CONCLUSION

The defendants used their power to remove plaintiffs in an attempt to create a compliant redevelopment authority. In doing so, the defendants violated the plain-

---

**15.** Defendants have not contested the amount of damages awarded by the jury.

tiffs' first amendment rights. The unlawfulness of their actions should have been apparent to them. The judgment appealed from is

*Affirmed.*