Kelley v. City of Manchester        CV-94-358-M    09/29/95
                    UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE


Manchester Police Patrolman's Association
and Edward J. Kelley
        Plaintiffs

V.                                              Civil No. 94-358-M


City of Manchester, Fernand Gelinas, Ray Seidel,
Dorothy Wageman, Peter Favreau, Donald Vandal,
Paul Brodeur, Thomas King and Louis Craig
        Defendants


                              **O R D E R**


        The Manchester Police Patrolmen's Association (the "Union")

and its president Edward J. Kelley ("Kelley") are suing the City

of Manchester, various current and former members of the

Manchester Police Department (the "MPD"), and certain members of

the Manchester Police Commission pursuant to 42 U.S.C. §1983 and

various New Hampshire statutes.  Plaintiffs allege that

defendants used the MPD's disciplinary system unlawfully to

retaliate against Kelley and the Union for exercising their First

Amendment rights.  Kelley and the Union argue that in doing so

defendants violated their rights to Due Process under the

Fourteenth Amendment.  Defendants move for summary judgment

arguing, <u>inter alia</u>, that as a matter of law they did not violate plaintiffs' constitutional rights.  In the alternative, defendants claim that summary judgment should be granted because they are entitled to qualified or absolute immunity and because plaintiffs' claims are barred by the doctrines of res judicata and collateral estoppel.

Plaintiffs' amended complaint (the "Complaint") is a rambling 75 page document, containing 350 separate paragraphs which chronicle plaintiffs' account of an alleged history of corruption in the Manchester police department as well as wholesale claimed deprivations of state and federal rights.  The complaint's length promises specificity and clarity but delivers ambiguity and confusion.  It has been only marginally useful as a description of the precise nature of plaintiffs' causes of action and the specific defendants against whom those claims are made.  Compounding that problem, in response to defendants' motion for summary judgment, plaintiffs submitted a memorandum of law in excess of 150 pages, containing more than 500 footnotes and referencing exhibits which contain literally thousands of pages of largely irrelevant documents obtained through pretrial discovery.

2

Unfortunately, that document too is dominated by vague anecdotes offered to support plaintiffs' allegations of misconduct in the MPD, but provides little specific factual and legal support for their claims.

**Background**

Reducing the complaint and other pleadings to readable form, the facts pertinent to this matter appear to be as follows. In 1990, Kelley was elected president of the Union. In that capacity, Kelley had a great deal of contact with supervisory personnel of the MPD. The Complaint recites numerous incidents which plaintiffs claim demonstrate the acrimony between Kelley and former police chief Louis Craig, current chief Peter Favreau, and other MPD supervisory personnel. The gravamen of the plaintiffs' Complaint, however, rests primarily on two events which eventually led to Kelley's being disciplined for violations of the MPD's Rules and Regulations.

A.    The Boisvert/Colbath Incident

In the early morning hours of August 3, 1993, a prominent New Hampshire liquor broker, Robert Colbath, was arrested for driving while under the influence of alcohol. After being taken

3

to a Manchester police station, Colbath called Roger Boisvert, then a Manchester Police Commissioner and New Hampshire Liquor Commissioner. Colbath was charged with speeding and was released to the custody of Boisvert. The next day, after news media asked about the episode, the MPD began an internal affairs investigation into the matter.

While that investigation was ongoing Kelley openly criticized Chief Craig and other supervisory personnel. For example, in the August 5, 1993, edition of the Manchester Union Leader newspaper Kelley is quoted as having said in reference to the Colbath matter: "When you're in trouble, it's who you know. When you know the right people you walk." Kelley also discussed the internal affairs investigation for the Union Leader. In the August 6th edition he is quoted as stating that the officer who arrested Colbath, James Flanagan, was under "extreme pressure" from superiors to drop the driving while intoxicating charge against Colbath. On August 7, the newspaper reported that Kelley stated, "What took place is good ol' boys politics. . . .It's gone on for years, contrary to what Craig says."

4

On August 9, 1993, Craig, through then-Deputy Chief Favreau, notified Kelley that he was being charged with five violations of the MPD Rules and Regulations. The notice alleged that Kelley made improper public statements, improperly released information concerning the business of the MPD, removed records from the MPD and provided them to the press, feigned illness, and gave false information regarding extra detail work he had performed earlier that summer. The August 9, 1993, charges also contained the following special instruction:

> You are hereby ordered to refrain from divulging to any unauthorized person, in or out of the Department, any information concerning the business of the Department unless authorized by the chief of police.[1]

---

[1] The charges relating to improper public statements and releasing information related to the business of the MPD, as well as the instruction not to divulge information concerning department business, were brought pursuant to the following regulations:

22. Dissemination of Information - A member or employee of the Department shall not divulge to any unauthorized person, in or out the Department, (i.e. one who does not have an official "need to know") any information concerning the business of the Department and shall not talk for publication, be interviewed, make public speeches on business or impart information relating to the official business of the Department unless authorized by the Chief.

23. Public Statements - Public derogatory or disrespectful statements which tend to undermine the efficiency or the morale of the Department, or statements which may subvert

5

The next day, August 10, 1993, the MPD charged Kelley with "discourtesy to a superior officer." That charge also specially instructed Kelley to remain silent regarding MPD business, including the charges against him. This "gag order" was eventually lifted three days later, after Kelley and the Union sought and obtained the intervention of the Manchester City Solicitor.

On October 13 and 14, 1993, more disciplinary charges were brought against Kelley relating to "disrespect to a superior officer" and record keeping violations stemming from traffic stops Kelley made during September of 1993. On January, 24, 25 and 28, 1994, an MPD disciplinary hearing board, chaired by defendant Vandal, met to consider the accumulating charges against Kelley. Kelley pled guilty to two charges of failure to

_____

public confidence in the Department are prohibited.

Manchester Police Department Rules & Regulations at R-1-17. The form by which Kelley was notified of the charges made against him contained the preprinted admonition not to divulge information concerning MPD business without prior authorization. That admonition is consistent with Rule 23 of the MPD Rules and Regulations by which the Union and its members specifically agreed to be bound when they executed the collective bargaining agreement. See Exh. B to defendants' motion for summary Judgment, Article 25.

file timely reports and agreed to accept four days' unpaid suspension from duty as punishment. The Board recommended to Chief Craig that Kelley, who was represented by counsel, be found guilty of two counts of discourteous behavior to a superior officer and recommended dismissal of the remaining charges. The Board also recommended that Kelley be suspended for a period ranging from two to eight weeks. On Sunday, January 30, 1994, the day before Chief Craig's previously announced retirement date, Kelley was summoned to MPD headquarters to receive Craig's disciplinary decision.

Chief Craig accepted the Board's recommendation as to guilt but, in light of Kelley's past disciplinary record,[2] determined the appropriate sanction to be a 34 day suspension without pay and termination. Craig suspended the termination, subject to the following conditions: that Kelley seek and obtain counseling; that the counselor find Kelley fit for duty; and that Kelley commit no other infractions of the MPD Rules and Regulations within one year.

---

[2] Kelley has a history of disciplinary problems, ranging from fairly minor incidents like filing illegible reports to more substantial transgressions like neglect of duty, insubordination, and use of unnecessary force. See Plaintiffs' Exhibits 32 and 38.

Kelley, again represented by counsel, appealed the Board's decision to the Manchester Police Commission, as was his right under applicable MPD disciplinary procedures.[3] On April 14, 15, and 22 the Commission, comprised of defendants Gelinas, Wageman, and Seidel, heard Kelley's appeal. Ultimately, the Commission upheld the Disciplinary Board's and Chief Craig's rulings as to guilt, but reduced the punishment to a two-week suspension without pay.

---

[3] The MPD Rules and Regulations provide:

Appeal Options - Every member upon receipt of formal charge and pacifications [sic], presented to him by the Administrative Division or the Chief's designee will be advised of the following options:

1. Chief of Police summary punishment
2. Disciplinary Board
3. Police Commission Review
4. Superior Court

* * *

Superior Court

If a member is dissatisfied with the findings and punishment of the Chief of Police, the Disciplinary Board and the Police Commission, the member has the right to appeal to the Superior Court.

Defendants' Exhibit A, at A-19-14 & 16.

Again, Kelley exercised his rights under the MPD disciplinary procedures and appealed the Commission's decision to the New Hampshire Superior Court. The Superior Court exercised certiorari jurisdiction and on January 10, 1995, held a hearing on the merits of Kelley's petition. As in this case, Kelley argued that he was the "victim of retaliatory disciplinary charges `as a result of the actions he took pursuant to his position as the President of the Manchester Patrolman's Association and in furtherance of his obligation to assure that the rights of his members are protected.'" <u>Kelley v. City of Manchester</u>, No. 94-E-170, slip op. at 1 (Hillsborough Cty. Sup. Ct., January 20, 1995) ("Kelley I"). Kelley also claimed that he had been denied due process, in violation of the state and federal constitutions. The court concluded, however, that Kelley had failed to establish that the MPD disciplinary process was tainted by conflicts of interest or a lack of procedural due process:

> The petitioner raises a number of issues in connection with his requests for equitable relief. Those issues fall into two categories: He first claims that disciplinary board members and the Commission appeal board members had conflicts of interest and were biased against him; he next claims that the disciplinary process deprived him of his rights to procedural due process.

The Court has carefully reviewed all of the materials submitted by the parties, including the entire transcript of the disciplinary board hearing. Based upon this review, and after consideration of the parties' arguments, I find that the disciplinary process was not tainted by either conflict of interest, or lack of procedural due process. Petitioner has failed to demonstrate that any of the members of the disciplinary hearing board or the Commission appeal board had any direct personal or pecuniary interest in the proceedings, had any other disqualifying conflict of interest, or was biased or []partial. Petitioner received a full and fair hearing by both the disciplinary board and the Commission appeal board. He received adequate notice of the charges, he was provided meaningful opportunity to be heard, he was given fair and adequate opportunity to present evidence and cross-examine the witnesses against him, he was given ample opportunity to argue his position, and the disciplinary decisions were supported by the evidence.

Kelley v. City of Manchester, at 3-4. Additionally, the court found that, contrary to Kelley's claim, his employment as a police officer was not effectively terminated as a result of the disciplinary action taken against him. Id. at 10 (granting Respondents' request for findings of fact no. 38). The court then concluded that:

the respondents have not acted illegally concerning their jurisdiction, authority or observance of the law, and that they have not abused their discretion or acted arbitrarily or capriciously.

10

_Id_. at 10.  Although Kelley attempted to appeal the Superior Court's decision to the New Hampshire Supreme Court, that appeal was dismissed because it was not filed in a timely fashion.

B.    Union Demonstration

The second principal episode underlying this dispute involves a gathering by Union members which took place on March 27, 1994.   The Union, concerned about proposed changes in Manchester City ordinances which would have allowed private "flag" companies to work roadside details, gathered between 30 and 80 of its off-duty members outside the homes of the Mayor of Manchester and certain city Aldermen to voice their opposition to the proposed changes.

At some point during the demonstration, Kelley received notice that he was to contact the Officer in Charge (the "OIC") immediately.   He claims that, after attempting to have another Union member contact the OIC and trying unsuccessfully to contact the OIC himself, he eventually spoke with the OIC.   On April 22, 1994, Chief Favreau brought a charge of "insubordination" against Kelley for failing to return the OIC's phone call during the

11

demonstration.[4]  On September 6, 1994, the MPD disciplinary Board held a hearing on the insubordination charge and an unrelated "discourtesy" charge.  On October 5, 1994, the disciplinary Board recommended that Kelley receive a 10 day, unpaid suspension on the insubordination charge and a written reprimand on the "discourtesy" charge.

Chief Favreau did not accept the Board's recommendation and instead suspended Kelley for 30 days and held another 120 days of suspension in abeyance.  Unlike the prior disciplinary suspension, Kelley was ordered to begin this suspension immediately.  Although he initially appealed Favreau's decision to the Superior Court, Kelley ultimately non-suited that action ("Kelley II").

---

[4]  The facts underlying the Union demonstration and forming the basis of the insubordination charge are discussed more fully in the decision issued by the New Hampshire Public Employee Labor Relations Board on November 3, 1994.  Manchester Police Patrolmen's Association v. City of Manchester, No. P-0706:26 (the "PELRB Order").  In response to disciplinary charges being filed against Kelley following the Union's demonstration, the Union filed a complaint with the PELRB, alleging that the city had committed unfair labor practices.  After conducting a hearing and considering all evidence presented by the parties, the PELRB concluded, however, that the city had not committed unfair labor practices and dismissed the complaint.  Specifically, the PELRB held that "the union was unable to prove that the purpose of the attempted inquiry of Kelley was to disrupt organized union activities."  PELRB Order at 4.  See Defendants' Exhibit I.

## Standard of Review

Summary Judgment is appropriate when the record reveals "no genuine issue of material fact and ...  the moving party is entitled to a judgement as a matter of law." Fed.R.Civ.P. 56(c). In ruling on the party's motion for summary judgment, the court must, "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  If the moving party carries its burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect brevis disposition." <u>Mesnick v. General Electric Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991), <u>cert. denied</u>, 504 U.S. 985, (1992).  <u>See</u> <u>also</u> Fed.R.Civ.P. 56(e).  This burden is discharged only if the cited disagreement relates to a genuine issue of material fact. <u>Wynne v. Tufts University School of Medicine</u>, 976 F.2d 791, 794 (1st Cir. 1992), <u>cert. denied</u>, ___ U.S. ___, 113

13

S.Ct. 1845 (1993). "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." United States v. One Parcel of Real Property with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

For the reasons set forth below, plaintiffs' counts fail on one or more grounds. With regard to some, they simply fail to state a cognizable cause of action. With regard to others, defendants are entitled to summary judgment. And, finally, many defendants are entitled to the protections afforded by qualified immunity. Accordingly, defendants' motion for summary judgment is granted.

**Discussion**

I. Preliminary Matters.

Plaintiffs' memorandum of law in opposition to defendants' motion for summary judgment states that, "[b]y agreement of counsel, Defendants Machos, King and Brodeur have been non-suited

14

without prejudice." Id. at 2 n.1. To date, however, plaintiffs have only filed the appropriate papers to non-suit (more accurately "voluntarily dismiss") defendant Machos. Nevertheless, based upon plaintiffs' representations that these defendants have been (or will be) "non-suited," the court will not address the counts pending against defendants King and Brodeur, which are hereby dismissed without prejudice. See Fed. R. Civ. P. 41.

With regard to Counts 7 and 16, Kelley and the Union allege that they were denied their rights to free expression, in violation of N.H. RSA 98-E:1 and 2. Those chapters provide, in pertinent part:

> 98-E:1 Freedom of Expression. Notwithstanding any other rule or order to the contrary, a person employed by the state in any capacity shall have a full right to publicly discuss and give opinions as an individual on all matters concerning the state and its policies. . . ..
>
> 98-E:2 Interference Prohibited. No person shall interfere in any way with the right of freedom of speech, full criticism or disclosure by any state employee.

(emphasis added). Plaintiffs do not allege that Kelley or any Union members are state employees. Nor have they provided any

15

pertinent authority to support their claim that, despite the plain and unambiguous language of this statute, it applies not only to state employees, but to municipal employees as well. Plaintiffs' reliance upon Appeal of Exeter, 126 N.H. 685 (1985), for the proposition that, "the freedom of expression guarantee of RSA 98-E applies to employees of the state, including . . . municipalities," Memorandum in Opposition to Summary Judgment at 145, is, at best, unsupported. In the absence of any legitimate precedents supporting plaintiffs' position, the court will not enlarge upon the New Hampshire Legislature's precise language to infer an intention to also provide municipal employees the type of statutory protections afforded to state employees. A federal court called upon to apply state law must "take state law as it finds it: `not as it might conceivably be, some day; nor even as it should be.'" Kassel v. Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989) (quoting Plummer v. Abbott Laboratories, 568 F.Supp. 920, 927 (D.R.I. 1983)). When state law has been authoritatively interpreted by the state's highest court, this court should apply that law according to its tenor. Kassel, 875 F.2d at 950. Where the signposts are blurred, the federal court may assume that the state court would adopt an interpretation of state law that is consistent with logic and supported by reasoned authority.

<u>Moores v. Greenberg</u>, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987).
However, this court is and should be hesitant to blaze new,
previously uncharted state-law trails.  Expansive reading of New
Hampshire statutes and recognition of novel causes of action
under those statutes is a practice best left to the New Hampshire
Supreme Court.  Counts 7 and 16 are dismissed for failure to
state a claim upon which relief might be granted.

Finally, at page 112 of plaintiffs' memorandum, they
acknowledge that Counts 8 and 17 of the Complaint fail to state a
claim upon which relief might be granted.  Accordingly, Counts 8
and 17 are dismissed.

II.  <u>Res Judicata and Collateral Estoppel</u>.

The federal full faith and credit statute, 28 U.S.C. §1738,
commands federal courts to employ state rules of res judicata
when determining the preclusive effect, if any, to be given to a
state court determination.  In <u>Marrese v. American Academy of
Orthopaedic Surgeons</u>, 470 U.S. 373 (1985), the Supreme Court
held:

> The preclusive effect of a state court judgment in a
> subsequent federal lawsuit generally is determined by

17

the full faith and credit statute, which provides that
state judicial proceedings "shall have the same full
faith and credit in every court within the United
States . . . as they have by law or usage in the courts
of such State . . . from which they are taken."  28
U.S.C. §1738.  This statute directs a federal court to
refer to the preclusion law of the state in which
judgment was rendered.  "It has long been established
that §1738 does not allow federal courts to employ
their own rules of res judicata in determining the
effect of state judgments.  Rather, it goes beyond the
common law and commands a federal court to accept the
rules chosen by the State from which the judgment is
taken."

Id. at 380 (citations omitted).  Accordingly, the court will

apply the principles of res judicata and collateral estoppel as

developed by the New Hampshire Supreme Court.


"The doctrine of res judicata precludes the litigation in a

later case of matters actually litigated, and matters that could

have been litigated, in an earlier action between the same

parties for the same cause of action."  In re Alfred P., 126 N.H.

628, 629 (1985) (citations omitted).  "In order for res judicata

to apply to a finding or ruling, there must be `a final judgment

by a court of competent jurisdiction [that] is conclusive upon

the parties in a subsequent litigation involving the same cause

of action.'"  In re Donovan, 137 N.H. 78, 81 (1993) (quoting

Marston v. U.S. Fidelity & Guaranty Co., 135 N.H. 706, 710

18

(1992)).  "The term `cause of action' means the right to recover, regardless of the theory of recovery."  Eastern Marine Constr. Corp. v. First S. Leasing, 129 N.H. 270, 274 (1987) (citations omitted).

Collateral estoppel is a related doctrine which "precludes the relitigation by a party in a later action of any matter actually litigated in a prior action in which he or someone in privity with him was a party."  In re Alfred P., 126 N.H. 628, 629 (1985).  "While collateral estoppel does not require an identity of the earlier and later causes of action, it precludes the relitigation only of issues actually raised and determined in the earlier litigation."  Morgenroth & Associates v. State, 126 N.H. 266, 270 (1985).

Three conditions must be met before collateral estoppel can arise: "The issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared as a party in the first action, or have been in privity with someone who did so.  These conditions must be understood, in turn, as particular elements of the more general requirement, that a party

against whom estoppel is pleaded must have had a full and fair prior opportunity to litigate the issue or fact in question." Daigle v. City of Portsmouth, 129 N.H. 561, 570 (1987).

"Normally, decisions of administrative agencies are entitled to res judicata effect when the agency acted in a judicial capacity." Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992) (citing University of Tennessee v. Elliott, 478 U.S. 788, 797-98 (1986)), cert. denied, ___ U.S. ___, 113 S. Ct. 1416 (1993). See also Morin v. J.H. Valliere Co., 113 N.H. 431, 434 (1973) ("Res judicata has been applied to a decision of an administrative agency, . . . which is rendered in a judicial capacity and resolves disputed issues properly before it which the parties have had an adequate opportunity to litigate.").

To the extent that res judicata and/or collateral estoppel preclude litigation of some of Kelley's causes of action in this forum, the Union is likewise barred from litigating its claims which arise directly out of those of Kelley. Stated differently, the Union, as representative of its members, including Kelley, cannot maintain an action if the underlying conduct upon which it depends (1) relates exclusively to claims made by Kelley or

20

conduct directed solely against Kelley; and (2) those claims of Kelley are barred by res judicata or collateral estoppel. Here, after carefully reviewing plaintiffs' pleadings and factual allegations in support of their claims, the court is unable to identify any claims filed by the Union which do not arise directly from alleged deprivations of Kelley's state or federal rights.[5] Accordingly, the Union's claims are barred by the doctrines of res judicata and/or collateral estoppel to the same extent as are those of Kelley.

Although certain named defendants were not parties to the state court proceedings, they are entitled to contend that collateral estoppel precludes relitigation of legal and factual matters already resolved. See, e.g., Rathgeb v. Carlinville Bd.

---

[5] The only factual allegation contained in the Complaint which arguably relates to Union members other than Kelley is set forth in paragraph 193, in which plaintiffs allege that:

> All Union Member [sic] interviewed, except Kelley, were advised that they were not the "target" of the internal affairs investigation [following the Union demonstration] and the wearing of uniforms at the demonstration was not the concern of the internal affairs investigation. Based on this assurance by the investigator, Union Members were forbidden Union representation.

However, plaintiffs have failed to link this allegation of impropriety to any of their specific causes of action.

of Police Comm'rs, No. 90-3180, 1993 U.S. Dist. LEXIS 18034 (C.D. Ill. May 28, 1993), aff'd without op. 14 F.3d 604 (7th Cir. 1993). Factual and legal issues that were fully and finally decided at the administrative or state level will not be relitigated in this forum. Here, the interests of the Manchester Police Commission and Manchester Police Department (defendants in Kelley I and Kelley II) cannot be disassociated from the interests of the individual members of those entities, who are named defendants in this action. While "privity is an elusive concept," Griffin v. Burns, 570 F.2d 1065, 1071 (1st Cir. 1978), the court is persuaded that the relationship between the Police Commission and Police Department and the individually named defendants is sufficiently close in the context of this case to permit the defendants to rely upon factual and legal determinations made in the context of the disciplinary hearings. See N.L.R.B. v. Donna-Lee Sportswear Co., 836 F.2d 31, 34-35 (1st Cir. 1987) (discussing the concept of "privity" as applied in the context of issue preclusion.).

**Counts 3 and 12.** It is unclear from plaintiffs' pleadings whether they claim to have been deprived of procedural or substantive due process (or both). Count 12 (Kelley's claim to

22

have been deprived of due process) is, to the extent that it asserts deprivations of procedural due process and rests upon incidents relating to his discipline following the Colbath incident and the Union demonstration, precluded by the doctrines of res judicata and collateral estoppel. It would however, survive preclusion to the extent that it stated a cause of action not related to those events. However, the court is unable to identify any alleged events unrelated to the Colbath incident and Union demonstration, which would support plaintiffs' claims in Count 12.

Likewise, Count 3 (the Union's claimed deprivation of due process) is necessarily dismissed as barred by the doctrines of res judicata and collateral estoppel. In Kelley I, the state court conclusively determined that Kelley (and, by extension, the Union, to the extent its claims are based on Kelley's) was not deprived of due process at any stage of the disciplinary process following the Colbath incident. And, because Kelley elected not to pursue his appellate rights in Kelley II, the findings of the appellate Board became final and not subject to the type of collateral attack presented here.

To the extent that plaintiffs claim to have been deprived of _substantive_ due process, defendants are entitled to judgment as a matter of law.  As the court of appeals for this circuit has noted:

> [A] substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible.  Stating the proposition does not cabin it very well.  It has been said, for instance, that substantive due process protects individuals against state actions which are "arbitrary and capricious," or those which run counter to "the concept of ordered liberty," or those which, in context, appear "shocking or violative of universal standards of decency."
>
> . . . Word play aside, we agree with Judge Friendly that, in the circumscribed precincts patrolled by substantive due process, it is only when some basic and fundamental principle has been transgressed that "the constitutional line has been crossed."

_Amsden v. Moran_, 904 F.2d 748, 753-54 (1st Cir. 1990) (citations omitted) _cert. denied_, 498 U.S. 1041 (1991).  Here, plaintiffs have not demonstrated that the "constitutional line" has been crossed or even approached, nor have they shown that there are any genuine issues of material fact which would preclude the granting of defendants' request for summary judgment.

24

**Counts 9 and 18 - Public Corruption.**  Similarly, Counts 9 and 18 (alleging that Kelley and the Union were deprived of equal protection and due process as a result of defendants' alleged corruption) are barred by res judicata and collateral estoppel. These counts rest upon plaintiffs' allegation that, "Defendants, through their agents and employees, . . . have authorized, supervised, instigated, condoned or participated in improper, unethical and illegal activities . . . [in] a pattern of corruption."  Complaint, ¶¶296 and 323.  However, the court in Kelley I specifically ruled that, "respondents have not acted illegally concerning their jurisdiction, authority or observance of the law, and that they have not abused their discretion or acted arbitrarily or capriciously."  Kelley I, Order at 10.  It also found that Kelley failed to sustain his claim that he was the victim of retaliatory disciplinary charges.  Accordingly, Kelley and the Union are estopped from alleging that Kelley was denied due process or selectively disciplined in an effort to punish him for exercising rights protected by the First Amendment.

For the reasons set forth above, defendants are entitled to judgment as a matter of law with regard to plaintiffs' claims of

25

denial of due process. With regard to plaintiffs' allegations that they were denied equal protection, the Court of Appeals for the First Circuit has held that liability for such a deprivation will attach only upon:

> proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989) (citations omitted). Plaintiffs have failed to establish that these conditions could be shown. They simply declare that defendants engaged in "actions which were designed to benefit the Defendants and provide favored treatment of one segment of society versus another segment of society." Complaint at ¶293. They do not identify which "segments of society" are being benefitted at the expense of others, nor do they specifically state who might comprise these amorphous "segments of society," nor have they provided affidavits or other evidence which would suggest that any form of discrimination or selective treatment "based on impermissible considerations" has taken place. Yerardi's, 878

26

F.2d at 21; see Coyne v. Somerville, 972 F.2d 440, 444-45 (1st Cir. 1992).

Finally, plaintiffs have failed to substantiate their vague assertion that this alleged discrimination is the product of some practice, custom, or unwritten policy of the city or the MPD. Without more, plaintiffs' conclusory allegations are insufficient to state a claim against the city or its individual officers sued in their official capacities. Monell v. Department of Social Servs., 436 U.S. 658 (1978). See also Jones v. Rhode Island, 724 F.Supp. 25, 32 (D.R.I. 1989); Zralka v. Tures, 708 F.Supp. 948, 950 (N.D. Ill. 1989).

III. State Constitutional Torts.

Counts 4-6 and 13-15. Plaintiffs' argue that, despite the New Hampshire Supreme Court's opinion in Rockhouse Mountain Property Owners Ass'n v. Conway, 127 N.H. 593 (1986), these counts state recognized and viable Bivens-type causes of action for alleged violations of their state constitutional rights. The court disagrees. In fact, less than one year ago this court (Devine, J.) held that in the absence of clear guidance from the New Hampshire Supreme Court, it will not recognize a cause of

27

action for alleged violations of rights guaranteed by the New Hampshire Constitution:

> [Plaintiffs] claim a right to damages in Count I based on a violation of the New Hampshire Constitution's equal protection clause. . . . The law in this circuit is that a plaintiff who chooses the federal forum cannot expect a federal court to break new ground in recognizing rights under state law that have not yet been identified by the state's own courts.  Since the New Hampshire Supreme Court has so far declined to recognize an implied right to damages for violations of the Pt. 1, Article 14 of the state's constitution, I grant defendants' motion to dismiss this claim.

Penney v. Town of Middleton, 888 F.Supp. 332, 242 (D.N.H. 1994) (citations omitted).  Accordingly, for the reasons set forth in Penney, plaintiffs' counts which claim a right to recover damages for alleged violations of New Hampshire constitutional guarantees of free speech, freedom of association, and due process (Counts 4, 5, 6, 13, 14, and 15) are dismissed.

IV.  Violations of Free Speech and Freedom of Assembly.

**Counts 1, 2, 10 and 11.**  For the purpose of addressing defendants' claims of immunity, the court will assume (without deciding) that plaintiffs' speech concerning the Colbath incident and the Union demonstration addressed matters of public concern and was, therefore, protected speech.  See Rankin v. McPherson,

28

483 U.S. 378 (1987); <u>Connick v. Myers</u>, 461 U.S. 138 (1983); <u>Pickering v. Board of Educ.</u>, 391 U.S. 563 (1968); <u>O'Connor v. Steeves</u>, 994 F.2d 905 (1st Cir.) <u>cert. denied sub nom.</u>, <u>Town of Nahant v. O'Connor</u>, ___ U.S. ___, 114 S.Ct. 634 (1993).

The doctrine of qualified immunity provides that, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). This doctrine recognizes that "officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages." <u>Davis v. Scherer</u>, 468 U.S. 183, 195 (1984). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the `objective legal reasonableness' of the action, . . . assessed in light of the legal rules that were `clearly established' at the time it was taken." <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987). As the Court of Appeals for the First Circuit has cautioned, however:

29

[I]n assessing a claim of qualified immunity, it is not sufficient for a court to ascertain in a general sense that the alleged right existed, otherwise "plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply be alleging violation of extremely abstract rights."

Borucki v. Ryan, 827 F.2d 836, (1st Cir. 1987) (quoting Anderson, 483 U.S. at 639). "To be `clearly established,' the `contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992) (quoting Anderson v. Creighton, supra, at 640)). "The determination whether or not a party is entitled to qualified immunity is a legal decision and it is reserved for the court." Whiting v. Kirk, 960 F.2d 248, 250 (1st Cir. 1992).

Plaintiffs do not allege that defendants failed to adhere to any of the procedural rules set forth in the MPD's Rules and Regulations with regard to the disciplining of Kelley.[6]  Instead,

---

[6]  Importantly, plaintiffs specifically agreed to abide by these Rules and Regulations when they ratified the collective bargaining agreement with the City of Manchester.  That agreement provides:

**Rules and Regulations**  The Rules and Regulations of the Manchester, New Hampshire Police Department which are now in

30

they allege that defendants enforced these procedures selectively, in an effort to chill plaintiffs' exercise of their constitutional rights. Again, however, plaintiffs are bound by the court's rulings in Kelley I (and by Kelley's dispositive withdrawal of the appeal in Kelley II) that defendants' conduct in disciplining Kelley was not illegal, ultra vires, arbitrary, or capricious, and that Kelley was not the subject of retaliatory discipline.[7]

In light of the court's findings in Kelley I and those in the PELRB Order, the court finds that reasonable officials in defendants' position would not have believed that by disciplining

_____

effect or as may be amended by the Police Commission shall be the prime governing factor in the conduct and actions of all police officers and every police officer shall be thoroughly conversant with them.

Exh. B to defendants' motion for summary judgment, at ¶25.1

[7] Additionally, as noted above, in Manchester Police Patrolmen's Ass'n v. City of Manchester, No. P-0706:26 (November 3, 1994), the New Hampshire Public Employee Labor Relations Board heard the Union's charges that the City had engaged in unfair labor practices during and following the Union demonstration. Specifically, the union charged that the inquiry into Kelley's conduct during the demonstration and the attempts to contact him were made in an effort to disrupt organized union activities. The Board specifically found that the Union and Kelley failed to sustain those allegations, concluding that "we find no restraint or coercion resulting from the several supervisory attempts to reach and speak with Kelley by telephone." Id. at 5.

31

Kelley for conduct prohibited by the MPD rules and regulations they would be violating his clearly established constitutional rights.  Simply because Kelley alleges that he has been disciplined for making public comments about the MPD does not compel the conclusion that defendants should have known that their conduct violated Kelley's clearly established rights.  See, e.g., O'Connor v. Steeves, 994 F.2d at 912 (a government employee may be discharged for public speech if such speech unduly impedes the government's interest in the efficient performance of the public service it delivers through its employees); Miller v. Hull, 878 F.2d 523, 532 n. 13 (1st Cir.) ("discharging a government employee because of his speech on matters of personal interest, or because of speech that disrupts his agency's work does not necessarily violate the First Amendment.") (citing Connick v. Myers, 461 U.S. 138 (1983)), cert. denied, 493 U.S. 976 (1989).  Moreover, when they ratified the collective bargaining agreement with the City, Kelley and the other Union members specifically agreed:

> not to divulge to any unauthorized person, in or out of
> the Department, (i.e., one who does not have an
> official "need to know") any information concerning the
> business of the Department and shall not talk for
> publication, be interviewed, make public speeches on
> police business or impart information relating to the

32

official business of the Department unless authorized
by the Chief.

MPD Rules and Regulations, para. 22. So, even if defendants believed that Kelley was being disciplined exclusively for having revealed internal information to the media, there was no reason for them to believe that such discipline would violate any of Kelley's clearly established rights. See, e.g., Leonard v. Clark, 12 F.3d 885, 889-90 (9th Cir. 1993) (through provisions in agreement between Union and its members and the city, union may voluntarily relinquish First Amendment rights).

Defendants Gelinas, Wageman, and Seidel (members of the police commission and the disciplinary board of appeals), former Chief Craig, and Chief Favreau are entitled to the protections afforded by qualified immunity. They were, in the context of this suit and the factual allegations underlying plaintiffs' claims, governmental officials performing discretionary (i.e., disciplinary and internal appellate review) functions. Plaintiffs have failed to point to any genuine issues of material fact which would preclude the court from finding that these defendants did not violate plaintiffs' clearly established constitutional rights. Simply asserting that Kelley was

33

disciplined following his exercise of free speech is insufficient to state a cause of action or establish that the rights allegedly violated by defendants were "clearly established." Here, defendants could not reasonably have known that their participation in the disciplinary process, by which the Union and its members agreed to be bound (and which the state court found was neither unlawful nor retaliatory) was likely to violate Kelley's clearly established rights.

As to the City of Manchester, plaintiffs have failed to provide the court with any tangible support for their claim that the alleged retaliation taken against Kelley was the product of some practice, custom, or unwritten policy of the city or the MPD. See Monell v. Department of Social Servs., 436 U.S. 658 (1978). In the absence of some indication of municipal direction via a policy, practice or custom, and given that a respondeat superior cause of action is not cognizable under §1983, Horta v. Sullivan, 4 F.3d 2, 13 (1st Cir. 1993), the city is entitled to summary judgment.

V. State Defamation Claims.

34

Having granted defendants' motion for summary judgment with regard to Counts 1 through 18, the court declines to exercise supplemental jurisdiction over plaintiffs' state defamation claims (Counts 19 and 20). The court, of course, makes no ruling on the viability of those state claims, which are dismissed without prejudice to plaintiffs' right to pursue them in state court. 28 U.S.C. §1367(c)(3); United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

## Conclusion

For the foregoing reasons, the court holds that defendants are entitled to judgment as a matter of law with regard to (and/or dismissal of) Counts 1 through 18. With regard to Counts 19 and 20, the court will decline to exercise supplemental jurisdiction over these state law claims and shall dismiss them without prejudice. To summarize:

> The individually named defendants are entitled to qualified immunity from liability on plaintiffs' claims as set forth in Counts 1, 2, 10, and 11, and the City of Manchester is entitled to judgment as a matter of law on those counts;

> Counts 3 and 12 are dismissed as barred by the doctrines of collateral estoppel and/or res judicata.

> Counts 4 through 9 and Counts 13 through 18 are dismissed because they fail to state a cause of action

35

and/or because defendants are entitled to summary judgment.

Counts 19 and 20 are dismissed, without prejudice to plaintiffs' right to pursue those claims in state court.

The court is not unmindful of the potential complexity of the issues which plaintiffs may be trying to raise in this case. After attempting to decipher plaintiffs' vague, repetitive, and ponderous pleadings, the court has endeavored to rule on the claims and issues which plaintiffs seem to be raising. Certainly, to the extent plaintiffs are claiming that Kelley has been selectively disciplined to punish him for having spoken out about perceived corruption in the MPD, he might have a basis for asserting a cognizable federal claim. However, Kelley has, on several occasions, litigated that very issue and, on each such occasion, it appears to have been resolved against him. Accordingly, he and the Union are likely estopped in this forum from reasserting those factual claims.

Ordinarily, the court would simply enter judgment in accordance with this order. However, the pleadings in this case are so convoluted, vague, and on occasion, indecipherable, that, to ensure that plaintiffs are not prejudiced by the fogginess of

36

the pleadings filed on their behalf, the court will delay entry of judgment in accordance with this order for thirty (30) days. During that period, plaintiffs may, if they choose, clearly and concisely show that: (1) the court has not accurately interpreted the substance of their complaint; (2) has incorrectly applied the law to the facts and allegations apparently set forth in the complaint; or (3) why they should be permitted to file a <u>concise</u>, <u>clearly articulated</u>, <u>and well founded</u> amended complaint. Plaintiffs' counsel is cautioned, however, that the court will not look favorably on any new pleadings drafted in the tradition of earlier pleadings in this case.  Should the plaintiffs decline the opportunity afforded them, judgment will be entered as directed herein.  Should plaintiffs take advantage of the opportunity, defendants may respond within 30 days of the date plaintiffs' pleadings are filed.

37

SO ORDERED.


_____
Steven J. McAuliffe
United States District Judge

September 29, 1995

cc:  Kenneth J. Gould, Esq.
     Joseph H. Groff III, Esq.
     Michael B. O'Shaughnessy, Esq.
     Cindy Robertson, Esq.