(Slip Opinion) OCTOBER TERM, 2010 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEVADA COMMISSION ON ETHICS *v.* CARRIGAN

### CERTIORARI TO THE SUPREME COURT OF NEVADA

No. 10–568.   Argued April 27, 2011—Decided June 13, 2011

Nevada's Ethics in Government Law requires public officials to recuse themselves from voting on, or advocating the passage or failure of, "a matter with respect to which the independence of judgment of a reasonable person in his situation would be materially affected by," *inter alia*, "[h]is commitment in a private capacity to the interests of others," Nev. Rev. Stat. §281A.420(2) (2007), which includes a "commitment to a [specified] person," *e.g.,* a member of the officer's household or the officer's relative, §281A.420(8)(a)–(d), and "[a]ny other commitment or relationship that is substantially similar" to one enumerated in paragraphs (a)–(d), §281A.420(8)(e).

Petitioner (Commission) administers and enforces Nevada's law. The Commission investigated respondent Carrigan, an elected local official who voted to approve a hotel/casino project proposed by a company that used Carrigan's long-time friend and campaign manager as a paid consultant. The Commission concluded that Carrigan had a disqualifying conflict of interest under §281A.420(8)(e)'s catchall provision, and censured him for failing to abstain from voting on the project. Carrigan sought judicial review, arguing that the Nevada law violated the First Amendment. The State District Court denied the petition, but the Nevada Supreme Court reversed, holding that voting is protected speech and that §281A.420(8)(e)'s catchall definition is unconstitutionally overbroad.

*Held:* The Nevada Ethics in Government Law is not unconstitutionally overbroad. Pp. 3–11.

 (a) That law prohibits a legislator who has a conflict both from voting on a proposal and from advocating its passage or failure. If it was constitutional to exclude Carrigan from voting, then his exclusion from advocating during a legislative session was not unconstitutional, for it was a reasonable time, place, and manner limitation.

Syllabus

See *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293. Pp. 3–4.

  (b) "[A] 'universal and long-established' tradition of prohibiting certain conduct creates 'a strong presumption' that the prohibition is constitutional.' " *Republican Party of Minn.* v. *White*, 536 U. S. 765, 785.  Here, dispositive evidence is provided by "early congressional enactments," which offer " 'contemporaneous and weighty evidence of the Constitution's meaning,' " *Printz* v. *United States*, 521 U. S. 898, 905.  Within 15 years of the founding, both the House and the Senate adopted recusal rules.  Federal conflict-of-interest rules applicable to judges also date back to the founding.  The notion that Nevada's recusal rules violate legislators' First Amendment rights is also inconsistent with long-standing traditions in the States, most of which have some type of recusal law.  Pp. 4–8.

  (c) Restrictions on legislators' voting are not restrictions on legislators' protected speech.  A legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal.  He casts his vote "as trustee for his constituents, not as a prerogative of personal power." *Raines* v. *Byrd*, 521 U. S. 811, 821.  Moreover, voting is not a symbolic action, and the fact that it is the product of a deeply held or highly unpopular personal belief does not transform it into First Amendment speech.  Even if the mere vote itself could express depth of belief (which it cannot), this Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message. See, *e.g., Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351.  *Doe* v. *Reed*, 561 U. S. ___, distinguished.  Pp. 8–10.

  (d) The additional arguments raised in Carrigan's brief were not decided below or raised in his brief in opposition and are thus considered waived.  P. 11.

126 Nev. 28, 236 P. 3d 616, reversed and remanded.

  SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  KENNEDY, J., filed a concurring opinion.  ALITO, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 10–568

---

## NEVADA COMMISSION ON ETHICS, PETITIONER *v.* MICHAEL A. CARRIGAN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEVADA

[June 13, 2011]

JUSTICE SCALIA delivered the opinion of the Court.

The Nevada Supreme Court invalidated a recusal provision of the State's Ethics in Government Law as unconstitutionally overbroad in violation of the First Amendment. We consider whether legislators have a personal, First Amendment right to vote on any given matter.

## I

Nevada's Ethics in Government Law provides that "a public officer shall not vote upon or advocate the passage or failure of, but may otherwise participate in the consideration of, a matter with respect to which the independence of judgment of a reasonable person in his situation would be materially affected by," *inter alia*, "[h]is commitment in a private capacity to the interests of others." Nev. Rev. Stat. §281A.420(2) (2007).[1]  Section

---

[1] At the time of the relevant events in this case, the disclosure and recusal provisions of the Ethics in Government Law were codified at Nev. Rev. Stat. §281.501 (2003). They were recodified without relevant change in 2007 at §281A.420, and all citations are to that version. The Nevada Legislature further amended the statute in 2009, see Nev. Stats., ch. 257, §9.5, p. 1057, but those changes are not relevant here.

281A.420(8)(a)–(d) of the law defines the term "commit-ment in a private capacity to the interests of others" to mean a "commitment to a person" who is a member of the officer's household; is related by blood, adoption, or mar-riage to the officer; employs the officer or a member of his household; or has a substantial and continuing business relationship with the officer. Paragraph (e) of the same subsection adds a catchall to that definition: "[a]ny other commitment or relationship that is substantially similar" to one of those listed in paragraphs (a)–(d).

The Ethics in Government Law is administered and enforced by the petitioner in this litigation, the Nevada Commission on Ethics. In 2005, the Commission initiated an investigation of Michael Carrigan, an elected member of the City Council of Sparks, Nevada, in response to complaints that Carrigan had violated §281A.420(2) by voting to approve an application for a hotel/casino project known as the "Lazy 8." Carrigan, the complaints asserted, had a disabling conflict in the matter because his long-time friend and campaign manager, Carlos Vasquez, worked as a paid consultant for the Red Hawk Land Com-pany, which had proposed the Lazy 8 project and would benefit from its approval.

Upon completion of its investigation, the Commission concluded that Carrigan had a disqualifying conflict of interest under §281A.420(8)(e)'s catchall provision because his relationship with Vasquez was "substantially similar" to the prohibited relationships listed in §281A.420(8)(a)–(d). Its written decision censured Carrigan for failing to abstain from voting on the Lazy 8 matter, but did not impose a civil penalty because his violation was not will-ful, see §281A.480. (Before the hearing, Carrigan had consulted the Sparks city attorney, who advised him that disclosing his relationship with Vasquez before voting on the Lazy 8 project, which he did, would satisfy his obliga-tions under the Ethics in Government Law.)

Carrigan filed a petition for judicial review in the First Judicial District Court of the State of Nevada, arguing that the provisions of the Ethics in Government Law that he was found to have violated were unconstitutional under the First Amendment. The District Court denied the petition, but a divided Nevada Supreme Court reversed. The majority held that voting was protected by the First Amendment, and, applying strict scrutiny, found that §281A.420(8)(e)'s catchall definition was unconstitutionally overbroad. 126 Nev. 28, \_\_\_–\_\_\_, 236 P. 3d 616, 621–624 (2010).

We granted certiorari, 562 U. S. \_\_\_ (2011).

## II

The First Amendment prohibits laws "abridging the freedom of speech," which, "'as a general matter . . . means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft* v. *American Civil Liberties Union*, 535 U. S. 564, 573 (2002) (quoting *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65 (1983)). But the Amendment has no application when what is restricted is not protected speech. See, *e.g.*, *Roth* v. *United States*, 354 U. S. 476, 483 (1957) (obscenity not protected speech). The Nevada Supreme Court thought a legislator's vote to be protected speech because voting "is a core legislative function." 126 Nev., at \_\_\_, 236 P. 3d, at 621 (internal quotation marks omitted).

We disagree, for the same reason. But before discussing that issue, we must address a preliminary detail: The challenged law not only prohibits the legislator who has a conflict from voting on the proposal in question, but also forbids him to "advocate the passage or failure" of the proposal—evidently meaning advocating its passage or failure during the legislative debate. Neither Carrigan nor any of his *amici* contend that the prohibition on advo-

cating can be unconstitutional if the prohibition on voting is not. And with good reason. Legislative sessions would become massive town-hall meetings if those who had a right to speak were not limited to those who had a right to vote. If Carrigan was constitutionally excluded from voting, his exclusion from "advocat[ing]" at the legislative session was a reasonable time, place and manner limitation. See *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984).

## III

"[A] universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional: Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Republican Party of Minn.* v. *White*, 536 U. S. 765, 785 (2002) (internal quotation marks omitted). Laws punishing libel and obscenity are not thought to violate "the freedom of speech" to which the First Amendment refers because such laws existed in 1791 and have been in place ever since. The same is true of legislative recusal rules. The Nevada Supreme Court and Carrigan have not cited a single decision invalidating a generally applicable conflict-of-interest recusal rule—and such rules have been commonplace for over 200 years.

"[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning,'" *Printz* v. *United States*, 521 U. S. 898, 905 (1997) (quoting *Bowsher* v. *Synar*, 478 U. S. 714, 723–724 (1986)). That evidence is dispositive here. Within 15 years of the founding, both the House of Representatives and the Senate adopted recusal rules. The House rule—to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 10 (1997)—was

adopted within a week of that chamber's first achieving a quorum.[2]  The rule read: "No member shall vote on any question, in the event of which he is immediately and particularly interested."  1 Annals of Cong. 99 (1789). Members of the House would have been subject to this recusal rule when they voted to submit the First Amendment for ratification; their failure to note any inconsistency between the two suggests that there was none.

The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate.  His rule provided as follows:

> "Where the private interests of a member are concerned in a bill or question, he is to withdraw.  And where such an interest has appeared, his voice [is] disallowed, even after a division.  In a case so contrary not only to the laws of decency, but to the fundamental principles of the social compact, which denies to any man to be a judge in his own case, it is for the honor of the house that this rule, of immemorial observance, should be strictly adhered to."  A Manual of Parliamentary Practice for the Use of the Senate of the United States 31 (1801).

Contemporaneous treatises on parliamentary procedure track parts of Jefferson's formulation.  See, *e.g.*, A. Clark, Manual, Compiled and Prepared for the Use of the [New York] Assembly 99 (1816); L. Cushing, Manual of Parliamentary Practice, Rules of Proceeding and Debate in Deliberative Assemblies 30 (7th ed. 1854).

Federal conflict-of-interest rules applicable to judges also date back to the founding.  In 1792, Congress passed a law requiring district court judges to recuse themselves if they had a personal interest in a suit or had been coun-

---

[2] The House first achieved a quorum on April 1, 1789, 1 Annals of Cong. 96, and it adopted rules governing its procedures on April 7, 1789, see *id.*, at 98–99.

sel to a party appearing before them. Act of May 8, 1792, ch. 36, §11, 1 Stat. 278–279. In 1821, Congress expanded these bases for recusal to include situations in which "the judge . . . is so related to, or connected with, either party, as to render it improper for him, in his opinion, to sit on the trial of such suit." Act of Mar. 3, 1821, ch. 51, 3 Stat. 643. The statute was again expanded in 1911, to make any "personal bias or prejudice" a basis for recusal. Act of Mar. 3, 1911, §21, 36 Stat. 1090. The current version, which retains much of the 1911 version's language, is codified at 28 U. S. C. §144. See generally *Liteky* v. *United States*, 510 U. S. 540, 544 (1994); Frank, Disqualification of Judges, 56 Yale L. J. 605, 626–630 (1947) (hereinafter Frank). There are of course differences between a legislator's vote and a judge's, and thus between legislative and judicial recusal rules; nevertheless, there do not appear to have been any serious challenges to judicial recusal statutes as having unconstitutionally restricted judges' First Amendment rights.[3]

The Nevada Supreme Court's belief that recusal rules violate legislators' First Amendment rights is also inconsistent with long-standing traditions in the States. A number of States, by common-law rule, have long required recusal of public officials with a conflict. See, *e.g.*, *In re Nashua*, 12 N. H. 425, 430 (1841) ("If one of the commissioners be interested, he shall not serve"); *Commissioners' Court* v. *Tarver*, 25 Ala. 480, 481 (1854) ("If any member . . . has a peculiar, personal interest, such member would be disqualified"); *Stubbs* v. *Florida State Finance Co.*, 118 Fla. 450, 451, 159 So. 527, 528 (1935) ("[A] public official cannot legally participate in his official

—————

[3] We have held that restrictions on judges' speech during elections are a different matter. See *Republican Party of Minn.* v. *White*, 536 U. S. 765, 788 (2002) (holding that it violated the First Amendment to prohibit announcement of views on disputed legal and political issues by candidates for judicial election).

capacity in the decision of a question in which he is personally and adversely interested").[4] Today, virtually every State has enacted some type of recusal law, many of which, not unlike Nevada's, require public officials to abstain from voting on all matters presenting a conflict of interest. See National Conference of State Legislatures, Voting Recusal Provisions (2009), online at http:// www.ncsl.org/?TabID=15357 (as visited June 9, 2011, and available in Clerk of Court's case file).

In an attempt to combat this overwhelming evidence of constitutional acceptability, Carrigan relies on a handful of lower-court cases from the 1980's and afterwards. See Brief for Respondent 25 (citing *Clark* v. *United States*, 886 F. 2d 404 (CADC 1989); *Miller* v. *Hull*, 878 F. 2d 523 (CA1 1989); and *Camacho* v. *Brandon*, 317 F. 3d 153 (CA2 2003)). Even if they were relevant, those cases would be too little and too late to contradict the long-recognized need for legislative recusal. But they are not relevant. The first was vacated as moot, see *Clark* v. *United States*, 915 F. 2d 699, 700, 706 (CADC 1990) (en banc), and the other two involve retaliation amounting to viewpoint discrimination. See *Miller, supra*, at 533; *Camacho, supra*, at 160. In the past we have applied heightened scrutiny to laws that are viewpoint discriminatory even as to speech *not* protected by the First Amendment, see *R. A. V.* v. *St. Paul*, 505 U. S. 377, 383–386 (1992). Carrigan does

———————

[4] A number of States enacted early judicial recusal laws as well. See, *e.g.*, 1797 Vt. Laws, §23, p. 178 ("[N]o justice of the peace shall take cognizance of any cause, where he shall be within either the first, second, third, or fourth degree of affinity, or consanguinity, to either of the parties, or shall be directly or indirectly interested, in the cause or matter to be determined"); 1818 Mass. Laws, §5, p. 632 ("[W]henever any Judge of Probate shall be interested in the estate of any person deceased, within the county of such Judge, such estate shall be settled in the Probate Court of the most ancient next adjoining county . . ."); *Macon* v. *Huff*, 60 Ga. 221, 223–226 (1878). See generally Frank 609– 626.

not assert that the recusal laws here are viewpoint discriminatory, nor could he: The statute is content-neutral and applies equally to all legislators regardless of party or position.

## IV

But how can it be that restrictions upon legislators' voting are not restrictions upon legislators' protected speech? The answer is that a legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it. As we said in *Raines* v. *Byrd*, 521 U. S. 811, 821 (1997), when denying Article III standing to legislators who claimed that their voting power had been diluted by a statute providing for a line-item veto, the legislator casts his vote "as trustee for his constituents, not as a prerogative of personal power." In this respect, voting by a legislator is different from voting by a citizen. While "a voter's franchise is a personal right," "[t]he procedures for voting in legislative assemblies . . . pertain to legislators not as individuals but as political representatives executing the legislative process." *Coleman* v. *Miller*, 307 U. S. 433, 469–470 (1939) (opinion of Frankfurter, J.).

Carrigan and JUSTICE ALITO say that legislators often "'us[e] their votes to express deeply held and highly unpopular views, often at great personal or political peril.'" *Post*, at 1 (opinion concurring in part and concurring in judgment) (quoting Brief for Respondent 23). How do they express those deeply held views, one wonders? Do ballots contain a check-one-of-the-boxes attachment that will be displayed to the public, reading something like "( ) I have a deeply held view about this; ( ) this is probably desirable; ( ) this is the least of the available evils; ( ) my personal view is the other way, but my constituents want this; ( )

my personal view is the other way, but my big contributors want this; ( ) I don't have the slightest idea what this legislation does, but on my way in to vote the party Whip said vote 'aye'"? There are, to be sure, instances where action conveys a symbolic meaning—such as the burning of a flag to convey disagreement with a country's policies, see *Texas* v. *Johnson*, 491 U. S. 397, 406 (1989). But the act of voting symbolizes nothing. It *discloses*, to be sure, that the legislator wishes (for whatever reason) that the proposition on the floor be adopted, just as a physical assault discloses that the attacker dislikes the victim. But neither the one nor the other is an act of communication. Cf. *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 66 (2006) (expressive value was "not created by the conduct itself but by the speech that accompanies it").

Moreover, the fact that a nonsymbolic act is the product of deeply held personal belief—even if the actor would like it to *convey* his deeply held personal belief—does not transform action into First Amendment speech. Nor does the fact that action may have social consequences—such as the unpopularity that cost John Quincy Adams his Senate seat resulting from his vote in favor of the Embargo Act of 1807, see *post*, at 1. However unpopular Adams' vote may have made him, and however deeply Adams felt that his vote was the right thing to do, the act of voting was still nonsymbolic conduct engaged in for an independent governmental purpose.

Even if it were true that the vote itself could "express deeply held and highly unpopular views," the argument would still miss the mark. This Court has rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message. For example, in *Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351 (1997), we upheld a State's prohibition on multiple-party or "fusion" candidates for elected office against a

First Amendment challenge. We admitted that a State's ban on a person's appearing on the ballot as the candidate of more than one party might prevent a party from "using the ballot to communicate to the public it supports a particular candidate who is already another party's candidate," *id.*, at 362; but we nonetheless were "unpersuaded . . . by the party's contention that it has a right to use the ballot itself to send a particularized message." *Id.*, at 362–363; see also *Burdick* v. *Takushi*, 504 U. S. 428, 438 (1992). In like manner, a legislator has no right to use official powers for expressive purposes.

Carrigan and JUSTICE ALITO also cite *Doe* v. *Reed*, 561 U. S. ___ (2010), as establishing "the expressive character of voting." *Post*, at 2; see also Brief for Respondent 26. But *Reed* did no such thing. That case held only that a citizen's signing of a petition—"'core political speech,'" *Meyer* v. *Grant*, 486 U. S. 414, 421–422 (1988)—was not deprived of its protected status simply because, under state law, a petition that garnered a sufficient number of signatures would suspend the state law to which it pertained, pending a referendum. See *Reed*, 561 U. S., at ___ (slip op., at 6); *id.*, at ___ (slip op., at 3) (opinion of SCALIA, J.). It is one thing to say that an inherently expressive act remains so despite its having governmental effect, but it is altogether another thing to say that a governmental act becomes expressive simply because the governmental actor wishes it to be so. We have never said the latter is true.[5]

_____

[5] JUSTICE ALITO reasons as follows: (1) If an ordinary citizen were to vote in a straw poll on an issue pending before a legislative body, that vote would be speech; (2) if a member of the legislative body were to do the same, it would be no less expressive; therefore (3) the legislator's actual vote must also be expressive. This conclusion does not follow. A legislator voting on a bill is not fairly analogized to one simply discussing that bill or expressing an opinion for or against it. The former is performing a governmental act as a representative of his constituents,

## V

Carrigan raises two additional arguments in his brief: that Nevada's catchall provision unconstitutionally burdens the right of association of officials and supporters, and that the provision is unconstitutionally vague. Whatever the merits of these arguments, we have no occasion to consider them. Neither was decided below: The Nevada Supreme Court made no mention of the former argument and said that it need not address the latter given its resolution of the overbreadth challenge, 126 Nev. ___, n. 4, 236 P. 3d, at 619, n. 4. Nor was either argument raised in Carrigan's brief in opposition to the petition for writ of certiorari. Arguments thus omitted are normally considered waived, see this Court's Rule 15.2; *Baldwin* v. *Reese*, 541 U. S. 27, 34 (2004), and we find no reason to sidestep that Rule here.

\*    \*    \*

The judgment of the Nevada Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

see *supra*, at 8; only the latter is exercising personal First Amendment rights.

# SUPREME COURT OF THE UNITED STATES

No. 10–568

NEVADA COMMISSION ON ETHICS, PETITIONER *v.*
MICHAEL A. CARRIGAN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NEVADA

[June 13, 2011]

JUSTICE KENNEDY, concurring.

For the reasons the Court explains, the act of casting an official vote is not itself protected by the Speech Clause of the First Amendment; and I join the Court's opinion.

It does seem appropriate to note that the opinion does not, and on this record should not, consider a free speech contention that would have presented issues of considerable import, were it to have been a proper part of the case. Neither in the submissions of the parties to this Court defining the issues presented, nor in the opinion of the Nevada Supreme Court, were the Nevada statutory provisions here at issue challenged or considered from the standpoint of burdens they impose on the First Amendment speech rights of legislators and constituents apart from an asserted right to engage in the act of casting a vote.

The statute may well impose substantial burdens on what undoubtedly is speech. The democratic process presumes a constant interchange of voices. Quite apart from the act of voting, speech takes place both in the election process and during the routine course of communications between and among legislators, candidates, citizens, groups active in the political process, the press, and the public at large. This speech and expression often finds powerful form in groups and associations with whom

a legislator or candidate has long and close ties, ties made all the stronger by shared outlook and civic purpose. The process is so intricate a part of communication in a democracy that it is difficult to describe in summary form, lest its fundamental character be understated. It may suffice, however, to note just a few examples.

Assume a citizen has strong and carefully considered positions on family life; the environment; economic principles; criminal justice; religious values; or the rights of persons. Assume, too, that based on those beliefs, he or she has personal ties with others who share those views. The occasion may arise when, to promote and protect these beliefs, close friends and associates, perhaps in concert with organized groups with whom the citizen also has close ties, urge the citizen to run for office. These persons and entities may offer strong support in an election campaign, support which itself can be expression in its classic form. The question then arises what application the Nevada statute has if a legislator who was elected with that support were to vote upon legislation central to the shared cause, or, for that matter, any other cause supported by those friends and affiliates.

As the Court notes, Nev. Rev. Stat. §281A.420(2) (2007) provides:

> "[A] public officer shall not vote upon or advocate the passage or failure of, but may otherwise participate in the consideration of, a matter with respect to which the independence of judgment of a reasonable person in his situation would be materially affected by . . . [h]is commitment in a private capacity to the interests of others."

There is, in my view, a serious concern that the statute imposes burdens on the communications and expressions just discussed. The immediate response might be that the statute does not apply because its application is confined

to the legislator's "commitment in a private capacity to the interests of others." That proposition may be a debatable one. At least without the benefit of further submissions or argument or explanation, it seems that one fair interpretation, if not the necessary one, is that the statute could apply to a legislator whose personal life is tied to the longstanding, close friendships he or she has forged in the common cause now at stake.

The application of the statute's language to the case just supposed, and to any number of variations on the supposition, is not apparent. And if the statute imposes unjustified burdens on speech or association protected by the First Amendment, or if it operates to chill or suppress the exercise of those freedoms by reason of vague terms or overbroad coverage, it is invalid. See *United States* v. *Williams*, 553 U. S. 285, 292–293, 304 (2008). A statute of this sort is an invitation to selective enforcement; and even if enforcement is undertaken in good faith, the dangers of suppression of particular speech or associational ties may well be too significant to be accepted. See *Gentile* v. *State Bar of Nev.*, 501 U. S. 1030, 1051 (1991).

The interests here at issue are at the heart of the First Amendment. "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 223 (1989) (internal quotation marks omitted). And the Court has made it clear that "the right of citizens to band together in promoting among the electorate candidates who espouse their political views" is among the First Amendment's most pressing concerns. *Clingman* v. *Beaver*, 544 U. S. 581, 586 (2005) (internal quotation marks omitted).

The constitutionality of a law prohibiting a legislative or executive official from voting on matters advanced by or associated with a political supporter is therefore a most serious matter from the standpoint of the logical and

inevitable burden on speech and association that preceded the vote. The restriction may impose a significant burden on activities protected by the First Amendment. As a general matter, citizens voice their support and lend their aid because they wish to confer the powers of public office on those whose positions correspond with their own. That dynamic, moreover, links the principles of participation and representation at the heart of our democratic government. Just as candidates announce positions in exchange for citizens' votes, *Brown* v. *Hartlage*, 456 U. S. 45, 55–56 (1982), so too citizens offer endorsements, advertise their views, and assist political campaigns based upon bonds of common purpose. These are the mechanisms that sustain representative democracy. See *ibid.*

The Court has held that due process may require recusal in the context of certain judicial determinations, see *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. ___ (2009); but as the foregoing indicates, it is not at all clear that a statute of this breadth can be enacted to extend principles of judicial impartiality to a quite different context. The differences between the role of political bodies in formulating and enforcing public policy, on the one hand, and the role of courts in adjudicating individual disputes according to law, on the other, see *ante*, at 6, may call for a different understanding of the responsibilities attendant upon holders of those respective offices and of the legitimate restrictions that may be imposed upon them.

For these reasons, the possibility that Carrigan was censured because he was thought to be beholden to a person who helped him win an election raises constitutional concerns of the first magnitude.

As the Court observes, however, the question whether Nevada's recusal statute was applied in a manner that burdens the First Amendment freedoms discussed above is not presented in this case. *Ante*, at 10.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–568

_____

## NEVADA COMMISSION ON ETHICS, PETITIONER *v.* MICHAEL A. CARRIGAN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEVADA

[June 13, 2011]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I concur in the judgment, but I do not agree with the opinion of the Court insofar as it suggests that restrictions upon legislators' voting are not restrictions upon legislators' speech. *Ante*, at 8. As respondent notes, "[o]ur history is rich with tales of legislators using their votes to express deeply held and highly unpopular views, often at great personal or political peril." Brief for Respondent 23. To illustrate this point, respondent notes, among other famous incidents, John Quincy Adams' vote in favor of the Embargo Act of 1807, a vote that is said to have cost him his Senate seat, and Sam Houston's vote against the Kansas-Nebraska Act, a vote that was deeply unpopular in the South. *Id.*, at 23–24 (citing J. Kennedy, Profiles in Courage 48, 109 (commemorative ed. 1991)).

In response to respondent's argument, the Court suggests that the "expressive value" of such votes is "'not created by the conduct itself but by the speech that accompanies it.'" *Ante*, at 9. This suggestion, however, is surely wrong. If John Quincy Adams and Sam Houston had done no more than cast the votes in question, their votes would still have spoken loudly and clearly to everyone who was interested in the bills in question. Voting has an expressive component in and of itself. The Court's

strange understanding of the concept of speech is shown by its suggestion that the symbolic act of burning the American flag is speech but John Quincy Adams calling out "yea" on the Embargo Act was not. *Ibid.*\*

A legislative vote is not speech, the Court tells us, because the vote may express, not the legislator's sincere personal view, but simply the view that is favored by the legislator's constituents. See *ibid.* But the same is sometimes true of legislators' speeches.

Not only is the Court incorrect in its analysis of the expressive character of voting, but the Court's position is inconsistent with our reasoning just last Term in *Doe* v. *Reed*, 561 U. S. ___ (2010). There, respondents argued that "signing a petition is a legally operative legislative act and therefore 'does not involve any significant expressive element.'" *Id.*, at ___ (slip op., at 6) (quoting Brief for Respondent Reed 31). But the Court rejected this argument, stating:

> "It is true that signing a referendum petition may ultimately have the legal consequence of requiring the secretary of state to place the referendum on the ballot. But we do not see how adding such legal effect to an expressive activity somehow deprives that activity of its expressive component, taking it outside the scope of the First Amendment." 561 U. S., at ___ (slip op., at 6).

But cf. *id.*, at ___ (SCALIA, J., concurring in judgment) (slip op., at 1) ("I doubt whether signing a petition that has the effect of suspending a law fits within 'the freedom of speech' at all").

Our reasoning in *Reed* is applicable here. Just as the act of signing a petition is not deprived of its expressive character when the signature is given legal consequences,

------------

\* See 17 Annals of Congress 50 (1807); see also 15 *id.*, at 201 (1806).

the act of voting is not drained of its expressive content when the vote has a legal effect. If an ordinary citizen casts a vote in a straw poll on an important proposal pending before a legislative body, that act indisputably constitutes a form of speech. If a member of the legislative body chooses to vote in the same straw poll, the legislator's act is no less expressive than that of an ordinary citizen. And if the legislator then votes on the measure in the legislative chamber, the expressive character of that vote is not eliminated simply because it may affect the outcome of the legislative process.

In Part III of its opinion, the Court demonstrates that legislative recusal rules were not regarded during the founding era as *impermissible* restrictions on freedom of speech. On that basis, I agree that the judgment below must be reversed.